CONNECTICUT INSURANCE GUARANTY
ASSOCIATION *v.* CAROL
FONTAINE ET AL.
(SC 17457)

Sullivan, C. J., and Borden, Norcott, Katz, Palmer, Vertefeuille and
Zarella, Js.*

---

\* The listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued February 15—officially released July 4, 2006

This case originally was argued before a panel of this court consisting of Justices Borden, Katz, Palmer, Vertefeuille and Zarella. Thereafter, the court, pursuant to Practice Book § 70-7 (b), sua sponte, ordered that the case be considered en banc. Accordingly, Chief Justice Sullivan and Justice Norcott were added to the panel. They have read the record, briefs and transcript of the oral argument.

*Gregg A. Rubenstein,* pro hac vice, with whom were *Charles W. Pieterse* and, on the brief, *Gerard N. Saggese III* and *Joseph C. Tanski,* pro hac vice, for the appellant (plaintiff).

*Antonio Ponvert III,* with whom was Ruth Daniella Weissman, for the appellee (named defendant).

*Opinion*

NORCOTT, J. In this appeal, we consider whether the trial court properly concluded that a loss of consortium claim is covered under the terms of a professional liability insurance policy covering claims that arise "because of bodily injury." The plaintiff, the Connecticut Insurance Guaranty Association (association), brought this declaratory judgment action to determine its obligation to pay a loss of consortium claim brought in connection with a medical malpractice action that had been commenced by the named defendant, Carol Fontaine, and her husband, Thomas Fontaine. The association appeals[1] from the judgment of the trial court granting the named defendant's cross motion for summary judgment on the basis of the insurance policy's plain and unambiguous language. We affirm the judgment of the trial court, but on the alternate ground that the language at issue is ambiguous and, therefore, properly construed against the association in place of the insolvent insurer that drafted the policy.

---

[1] The association appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

The record reveals the following undisputed facts and procedural history. In 1999, the named defendant and her husband brought an action against the defendant physician, Michael Jimenez,[2] alleging that his medical malpractice had caused Thomas Fontaine bodily injury, and the defendant a resulting loss of consortium. At the time of the alleged malpractice, Jimenez was insured by the PHICO Insurance Company (PHICO) under a policy that covered "[p]hysician and [s]urgeon [p]rofessional [l]iability" and "[i]nstitutional [p]rofessional [l]iability." The relevant portion of the policy stated that PHICO "agree[d] with the named insured to pay on behalf of the insured all sums which the insured shall be legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies caused by a medical incident . . . ." The policy further defined " '[b]odily [i]njury' " as " 'injury to the human body, illness or disease sustained by [a] person, including death at any time resulting therefrom.' " Thereafter, PHICO was declared insolvent by a Pennsylvania court of competent jurisdiction, and the association became responsible for the payment of all "covered claims" pursuant to the Connecticut Insurance Guaranty Act (guaranty act), General Statutes § 38a-836 et seq.

The association then brought this declaratory judgment action seeking determinations, inter alia, that it has: (1) "no obligation to pay [the defendant's] claim for loss of consortium"; and (2) "no obligation to defend or indemnify . . . Jimenez with respect to [the defendant's] loss of consortium claim." The plaintiff moved, and the defendant cross moved, for summary judgment, with each party claiming that the relevant policy lan-

_____

[2] The association also named Jimenez a defendant in this declaratory judgment action, but subsequently withdrew the complaint against him, and he has not filed a brief in this appeal. Hereafter, all references in this opinion to the defendant are to Carol Fontaine.

guage clearly and unambiguously supported its posi-
tion. The trial court denied the plaintiff's motion and
granted the defendant's cross motion for summary judg-
ment, concluding that, "it is clear under the policy that
[the defendant's] loss of consortium claim comes within
the coverage for damages *because of* . . . bodily injury
. . . caused by a medical incident . . . . In this action,
the coverage is not limited by the policy terms to dam-
ages paid for the direct bodily injury suffered by
[Thomas] Fontaine. The language at issue does not
require that recovery be limited to one who sustained
a bodily injury. . . . [T]here is *no question of material*
fact that [the defendant's] claim for loss of consortium is
covered under the terms and conditions of the policy."[3]
(Citations omitted; emphasis in original; internal quota-
tion marks omitted.) This appeal followed.

On appeal, the association, relying primarily on this
court's decision in *Izzo* v. *Colonial Penn Ins. Co.*, 203
Conn. 305, 524 A.2d 641 (1987), and the decision of the
United States Court of Appeals for the First Circuit in
*Diamond International Corp.* v. *Allstate Ins. Co.*, 712
F.2d 1498 (1st Cir. 1983), claims that the unambiguous
language of the policy is limited to claims for bodily
injuries, which precludes coverage for the defendant
because she has not suffered a bodily injury, and claims
only loss of consortium. In response, the defendant

[3] Although all parties had claimed that the policy language clearly and
unambiguously supported their respective positions, the trial court initially
found the language ambiguous. It, therefore, granted the defendant's motion
for summary judgment on the basis that, because the policy language was
ambiguous, it was to be construed in favor of the insured under the doctrine
of contra proferentem. Thereafter, the association moved for reargument,
claiming that this doctrine for resolution of ambiguities does not apply to
the association, and that discovery and a trial on the merits were required
to determine whether the parties intended to provide insurance coverage
for loss of consortium claims. The trial court then vacated its initial memo-
randum of decision, and issued a substitute memorandum of decision grant-
ing the defendant's cross motion for summary judgment on the basis that
the policy's plain and unambiguous language supported her position.

contends that the association's reliance on *Izzo* is misplaced and that its reading of the policy's plain language ignores the import of the phrase, " 'damages *because of* bodily injury,' " as her loss of consortium claim would not exist, but for her husband's bodily injury. (Emphasis added.) The defendant also claims, alternatively, that the policy's language is ambiguous and, under the well established doctrine of contra proferentem, should be construed against the insurer, or in the present case, the association in the insurer's place.[4] We conclude that the policy language is ambiguous and should, therefore, be construed to afford coverage for the defendant's loss of consortium claim.

"We begin by setting forth the well settled standard of review for interpreting insurance contracts. [C]onstruction of a contract of insurance presents a question of law for the court which this court reviews de novo. . . . It is the function of the court to construe the provisions of the contract of insurance. . . . The [i]nterpretation of an insurance policy . . . involves a determination of the intent of the parties as expressed by the language of the policy . . . [including] what coverage the . . . [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy. . . . [A] contract of insurance must be viewed in its entirety, and the intent of the parties for entering it derived from the four corners of the

---

[4] We note that this argument and the association's opposition thereto were properly raised before, and ruled on, by the trial court when it applied the doctrine of contra proferentem in the initial memorandum of decision construing the policy in favor of the defendant. See footnote 3 of this opinion; see also *New Haven* v. *Bonner*, 272 Conn. 489, 498, 863 A.2d 680 (2005) (alternate grounds for affirmance must be raised before trial court). Moreover, although the defendant failed to raise this issue as a separate alternate ground for affirmance in a responsive statement pursuant to Practice Book § 63-4 (a) (1), we may consider it because doing so will not prejudice the association, which has discussed the issue extensively in its opening brief. See, e.g., *Liscio* v. *Liscio*, 204 Conn. 502, 506 n.6, 528 A.2d 1143 (1987).

policy . . . [giving the] words . . . [of the policy] their natural and ordinary meaning . . . [and construing] any ambiguity in the terms . . . in favor of the insured . . . ." (Citation omitted; internal quotation marks omitted.) *Hartford Casualty Ins. Co.* v. *Litchfield Mutual Fire Ins. Co.*, 274 Conn. 457, 462–63, 876 A.2d 1139 (2005). Moreover, although the legal definition of the disputed claim is relevant in determining whether that claim is covered under the policy language at issue, that policy language remains the touchstone of our inquiry. See *Galgano* v. *Metropolitan Property & Casualty Ins. Co.*, 267 Conn. 512, 518, 838 A.2d 993 (2004) (although plaintiff's bystander emotional distress forms basis of "separate and independent direct action," that characterization was not determinative of whether that claim was subject to coverage limit applicable to claims arising from physical injuries to plaintiff's son).

We begin our coverage analysis by briefly reviewing the nature of the action for loss of consortium, which this court first recognized in *Hopson* v. *St. Mary's Hospital*, 176 Conn. 485, 486, 408 A.2d 260 (1979), a medical malpractice case in which this court concluded that a husband had a valid claim that, "because of the defendants' negligence he was deprived of the love, affection and consortium of his wife . . . ." See also id., 487 (overruling *Marri* v. *Stamford Street R. Co.*, 84 Conn. 9, 78 A. 582 [1911], which held that "a married person whose spouse has been injured by the negligence of a third party has no cause of action for loss of consortium").[5] "A cause of action for loss of consortium does

---

[5] The definition of the term "consortium" includes spousal services, financial support and "the variety of intangible relations which exist between spouses living together in marriage. . . . These intangible elements are generally described in terms of 'affection, society, companionship and sexual relations.' . . . These intangibles have also been defined as the 'constellation of companionship, dependence, reliance, affection, sharing and aid which are legally recognizable, protected rights arising out of the civil contract of marriage.'" (Citations omitted.) *Hopson* v. *St. Mary's Hospital*, supra, 176 Conn. 487.

not arise out of a bodily injury to the spouse suffering the loss of consortium; it arises out of the bodily injury to the spouse who can no longer perform the spousal functions." *Izzo* v. *Colonial Penn Ins. Co.*, supra, 203 Conn. 312. "[A]lthough loss of consortium is a separate cause of action, it is an action [which] is derivative of the injured spouse's cause of action. . . . Loss of consortium, although a separate cause of action, is not truly independent, but rather derivative and inextricably attached to the claim of the injured spouse." (Citation omitted; internal quotation marks omited.) Id.; see also *Champagne* v. *Raybestos-Manhattan, Inc.*, 212 Conn. 509, 555–56, 562 A.2d 1100 (1989) (loss of consortium recovery may be diminished by injured spouse's comparative responsibility, even when punitive damages have been awarded, because "derivative action is dependent upon the legal existence of the predicate action, i.e., that action which can be brought on behalf of the injured spouse himself or herself").

We next determine whether the term "because of bodily injury" is ambiguous with respect to loss of consortium claims in the context of a policy wherein the insurer "agree[d] with the named insured to pay on behalf of the insured all sums which the insured shall be legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies caused by a medical incident . . . ." (Emphasis added.) See *Hartford Casualty Ins. Co.* v. *Litchfield Mutual Fire Ins. Co.*, supra, 274 Conn. 462–63. "The fact that the parties advocate different meanings of the [insurance policy] does not necessitate a conclusion that the language is ambiguous." (Internal quotation marks omitted.) *Springdale Donuts, Inc.* v. *Aetna Casualty & Surety Co. of Illinois*, 247 Conn. 801, 806, 724 A.2d 1117 (1999). Rather, insurance policy language is ambiguous if we determine that it is "reasonably susceptible to more than one reading." (Internal quota-

tion marks omitted.) *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, 255 Conn. 295, 305, 765 A.2d 891 (2001); see also, e.g., *Allstate Ins. Co.* v. *Barron*, 269 Conn. 394, 406, 848 A.2d 1165 (2004) ("[w]hen the words of an insurance contract are, without violence, susceptible of two [equally reasonable] interpretations, that which will sustain the claim and cover the loss must, in preference, be adopted" [internal quotation marks omitted]).

We start our ambiguity inquiry with the language of the key phrase "because of bodily injury." The phrase "because of" has been defined as "[o]n account of; by reason of." American Heritage College Dictionary (4th Ed. 2002); see also id. (defining "because" as "[f]or the reason that; since"). It is undisputed that the defendant's husband, but not the defendant, suffered a "bodily injury," as that term is defined by the policy as " 'injury to the human body, illness or disease sustained by [a] person, including death at any time resulting therefrom.' " We conclude that this policy language is ambiguous because the association reasonably reads this phrase as limiting the insurer's obligation to paying damages caused only by direct injury to the body of the affected person, while the defendant adopts a reasonable, but more expansive reading of the policy language, which would encompass claims such as loss of consortium that are derivative, and would not exist, but for a predicate "bodily injury." Indeed, the reasonableness of both parties' positions is exemplified by the split of authority on this very point between two other New England appellate courts, both of which are cited by the association. Compare *Diamond International Corp.* v. *Allstate Ins. Co.*, supra, 712 F.2d 1504–1505 (applying New Hampshire law and concluding that insurer was not obligated "to cover suits brought by third parties for losses occasioned by a covered bodily injury to another person" because "bodily injury" defini-

tion did not include "loss of services" [internal quotation marks omitted]) with *Worcester Ins. Co.* v. *Fells Acres Day School, Inc.*, 408 Mass. 393, 415, 558 N.E.2d 958 (1990) (concluding that failure of "bodily injury" definition to include loss of services did not preclude coverage for loss of consortium claim because "the simplest and most direct interpretation of damages because of bodily injury includes any damages, including loss of consortium, arising from a bodily injury" [internal quotation marks omitted]).[6]

Thus, having concluded that the relevant policy language is ambiguous, we ordinarily would be free to consider extrinsic evidence, although "[i]f the extrinsic evidence presents issues of credibility or a choice among reasonable inferences, the decision on the intent of the parties is a job for the trier of fact." (Internal quotation marks omitted.) *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, supra, 255 Conn. 306. The present case is, however, before both the trial court and this court on a statement of stipulated facts, and, accordingly, the language falls into the category of ambiguities "that cannot be resolved by examining the parties' intentions." Id. We, therefore, conclude that "the ambiguous language should be construed in accordance with the reasonable expectations of the insured when he entered into the contract. . . . Courts in such situations often apply the contra proferentem rule and interpret a policy against the insurer." (Citation omitted; internal quotation marks omitted.) Id. Indeed, our interpretation of ambiguous policy language in favor of coverage under the doctrine of contra proferentem has

---

[6] See also *Sparks* v. *American Fire & Indemnity Co.*, 769 P.2d 501, 503 (Colo. App. 1989) (husband could recover loss of consortium damages under uninsured motorist policy when wife sustained "bodily injury" and policy allowed recovery "for damages . . . because of bodily injury to which this coverage applies" [internal quotation marks omitted]), overruled on other grounds by *Allstate Ins. Co.* v. *Allen*, 797 P.2d 46, 49 n.3 (Colo. 1990) (prejudgment interest award is subject to policy limits).

become near axiomatic in insurance coverage disputes.[7] See, e.g., *R.T. Vanderbilt Co.* v. *Continental Casualty Co.*, 273 Conn. 448, 465, 870 A.2d 1048 (2005) (policy language ambiguous when two "equally reasonable" definitions of term "suit" exist, so interpretation allowing for coverage must be adopted); *Allstate Ins. Co.* v. *Barron*, supra, 269 Conn. 406 ("[w]hen the words of an insurance contract are, without violence, susceptible of two [equally reasonable] interpretations, that which will sustain the claim and cover the loss must, in preference, be adopted" [internal quotation marks omitted]). We see no reason to distinguish between the rule's application as to an insurance company that drafted the policy; see footnote 7 of this opinion; and its application as to another entity that assumes the drafter's responsibilities, in other words, that stands in the shoes of the drafter. Thus, we read the ambiguous language in favor of extending insurance coverage, and we conclude that the defendant's loss of consortium claim is covered under the policy because it would not exist but for the bodily injury to her husband.

The association claims, however, that this conclusion is inconsistent with the guaranty act, which it contends precludes application of the contra proferentem rule in this context. We disagree. The association does not point to any provision of the act purporting to alter the usual methods of interpreting insurance policies, and

---

[7] We explained the policy reasons behind the contra proferentem rule, which is "more rigorously applied in the context of insurance contracts than in other contracts," in *Israel* v. *State Farm Mutual Automobile Ins. Co.*, 259 Conn. 503, 509, 789 A.2d 974 (2002). "The premise behind the rule is simple. The party who actually does the writing of an instrument will presumably be guided by his own interests and goals in the transaction. He may choose shadings of expression, words more specific or more imprecise, according to the dictates of these interests. . . . A further, related rationale for the rule is that [s]ince one who speaks or writes, can by exactness of expression more easily prevent mistakes in meaning, than one with whom he is dealing, doubts arising from ambiguity are resolved in favor of the latter." (Internal quotation marks omitted.) Id., 508–509.

relies primarily on the general description of the association's responsibilities from this court's decision in *Hunnihan* v. *Mattatuck Mfg. Co.*, 243 Conn. 438, 451, 705 A.2d 1012 (1997), providing that "[t]he association was established for the purpose of providing a *limited form of protection for policyholders and claimants* in the event of insurer insolvency. The protection it provides is limited based upon its status as a nonprofit entity and the method by which it is funded. Specifically, the association is a nonprofit legal entity created by statute to which all persons licensed to transact insurance in the state must belong. . . . When an insurer is determined to be insolvent . . . the association becomes obligated . . . *to the extent of covered claims within certain limits.* The rates and premiums charged by member insurers are authorized . . . to include amounts sufficient to recoup the assessments levied upon insurers by the association. Because . . . insurers may pass on the costs of the assessments made against them by the association, it is in reality policyholders who pay for the protections afforded by the association. *Limitations on the association's obligations, therefore, provide another form of protection against increased premiums for policyholders in addition to the primary protection afforded all claimants against losses resulting from insurer insolvency.*" (Citation omitted; emphasis added.)

Any review of the guaranty act's legislative history is incomplete without consideration of the very next paragraph of *Hunnihan*, which provides that "[t]he legislative history confirms that the association was established for the benefit of consumers. At the public hearing held prior to passage of the bill proposing the creation of the association, Peter Kelly, a member of the state insurance department stated: [*T*]*his bill provides the means to avoid financial loss to Connecticut residents because of the insolvency of* [*insurance com-*

*panies*]. . . . In the late 1960s . . . [c]onsumers were being hurt and on a personal scale, an insolvency can be ruinous. . . . [The bill] provides the means for all insurance companies assessed to recover from the entire insured residents of this state the cost of such assessments so that it is really not an assessment on a company but an assessment on the entire residents of the state who are insured after the fact. This is spreading the risk amongst all Connecticut residents. . . . I think you must remember that industry is not paying the cost. This bill provides that Connecticut residents will pay the cost. . . . This bill provides for protections of residents of this state and the residents if any assessments are ever made will pay for the cost of such assessments in their future insurance premiums." (Emphasis added; internal quotation marks omitted.) Id., 452, quoting Conn. Joint Standing Committee Hearings, Insurance and Real Estate, 1971 Sess., pp. 55–59.

Moreover, the association's reliance on General Statutes § 38a-838 (5), which defines "covered claim" under the guaranty act, is similarly circular and unpersuasive. Section 38a-838 (5) provides in relevant part that a " '[c]overed claim' " is an "unpaid claim, including, but not limited to, one for unearned premiums, which arises out of and is within the coverage and subject to the applicable limits of an insurance policy to which sections 38a-836 to 38a-853, inclusive, apply . . . ." This statutory definition does not provide any specific direction as to how to interpret the insurance policies at issue. Indeed, we have noted that, "[i]n general, the legislative objective was to make the [association] liable to the same extent that the insolvent insurer would have been liable under its policy." (Internal quotation marks omitted.) *Connecticut Ins. Guaranty Assn.* v. *Union Carbide Corp.*, 217 Conn. 371, 390, 585 A.2d 1216 (1991) (association may not use exhaustion or nonduplication of recovery provisions to avoid respon-

sibilities for paying claims that should have been covered by insolvent excess insurer). Thus, we disagree with the association's argument that the rationale behind the rule of contra proferentem; see footnote 7 of this opinion; is inapplicable in this context since it did not draft the policies at issue, because acceptance of that position would frustrate the legislature's objective in enacting the guaranty act.

We also note that other state courts applying substantively the same guaranty act have followed the usual contra proferentem rule of construing ambiguous insurance policies in favor of affording coverage, even when the ultimate payer will be an insurance guaranty association.[8] See *Alabama Ins. Guaranty Assn.* v. *Magic City Trucking, Inc.*, 547 So. 2d 849, 855–56 (Ala. 1989) (concluding in case wherein both primary insurer and excess insurer were insolvent that, under ambiguous language of excess policy, excess coverage "dropped down" and guaranty association was required to pay full amount recoverable under excess policy); *Florida Ins. Guaranty Assn.* v. *Johnson*, 654 So. 2d 239, 240 (Fla. App. 1995) (construing insolvent insurer's ambiguous policy provision governing payment of supplemental expenses in addition to liability caps with "intent of extending coverage"); *Missouri Property & Casualty Ins. Guaranty Assn.* v. *Petrolite Corp.*, 918 S.W.2d 869, 872 (Mo. App. 1996) (construing insolvent insurer's ambiguous policy in favor of insured with respect to coverage of intentional discrimination claims); *Guttman Oil Co.* v. *Pennsylvania Ins. Guaranty Assn.*, 429 Pa. Super. 523, 529, 632 A.2d 1345 (1993) (considering insurance guaranty association to be drafter when construing insolvent

---

[8] Sister state decisions are helpful in construing and applying the guaranty act because it is "based on a model statute drafted by the National Association of Insurance Commissioners that has been adopted in substantial part by the legislatures of many of our sister states . . . ." *Robinson* v. *Gailno*, 275 Conn. 290, 300, 880 A.2d 127 (2005).

insurer's ambiguous policy in favor of insured with respect to time limitation for commencement of suit to recover improperly withheld deductibles), appeal denied, 537 Pa. 663, 644 A.2d 1200 (1994).[9]

Finally, our conclusion that the ambiguous policy language encompasses the defendant's loss of consortium claim is consistent with our decision in *Izzo* v. *Colonial Penn Ins. Co.*, supra, 203 Conn. 305, a case upon which both parties rely. In *Izzo*, which involved the interpretation of insurance policy language similar to that at issue in the present case,[10] the insurers did not "argue that a claim for loss of consortium is not covered by the policy. Instead, [they] argue[d] that their liability is limited to $100,000, an amount which they have already paid" to the injured spouse under the automobile liability policy at issue. Id., 309 n.4. This court adopted the majority approach to this issue and

[9] In further support of its argument that the doctrine of contra proferentem is inapplicable because it did not draft the policy terms at issue, the association relies on a line of out-of-state cases holding that the doctrine is inapplicable when the ambiguous policy terms are dictated by legislation or regulation; in such cases, ordinary rules of statutory construction apply. See, e.g., *Paul Revere Life Ins. Co.* v. *Haas*, 137 N.J. 190, 199, 644 A.2d 1098 (1994) (statutorily mandated incontestability clause in disability insurance policy). The association's reliance on these cases is misplaced because it points to nothing in this record demonstrating that the policy terms at issue were the product of governmental creation or imposition. That the association's responsibilities are themselves creatures of statute has nothing to do with our construction of the policy terms at issue.

[10] The policy language at issue in *Izzo* provided that the insurer "will pay all sums that the insured under this coverage is legally required to pay as damages for bodily injury. . . . The Limits of Coverage portion of the policy stated that [t]here are two limits of coverage for Bodily Injury Liability. The amount shown on your Declarations Page for Each Person [$100,000] is the most [w]e'll pay for damages because of bodily injury to one person caused by any one occurrence. The amount shown on your Declarations Page for Each Occurrence [$300,000] is the most we'll pay for all damages as a result of any one occurrence, no matter how many people are injured. . . . Bodily Injury, as defined in the policy, means injury to a persons body, sickness or disease, and death that results from any of these." (Internal quotation marks omitted.) *Izzo* v. *Colonial Penn Ins. Co.*, supra, 203 Conn. 309.

concluded that the " 'per person' limit applies to all damages resulting from bodily injury to one person, including a claim for loss of consortium." Id., 312–13. Thus, the loss of consortium claim did not constitute a separate claim that could be paid under the policy's higher " 'per occurrence' " limit. Id., 311–13. In so concluding, this court noted that "the plaintiff would not have a claim under this policy for damages for loss of consortium but for the bodily injury his wife sustained in the accident . . . . A cause of action for loss of consortium does not arise out of a bodily injury to the spouse suffering the loss of consortium; it arises out of the bodily injury to the spouse who can no longer perform the spousal functions." Id., 312. Thus, *Izzo* supports the defendant's position that her loss of consortium claim exists "because of" her husband's bodily injury, particularly in light of the fact that this case does not require us to determine whether it fits into a particular category of damages, such as the "per person" limit at issue in that case.[11]

The judgment is affirmed.

In this opinion the other justices concurred.

---

[11] Accordingly, the association's reliance on some of the many sister state cases that deal with the issue in *Izzo* v. *Colonial Penn Ins. Co.*, supra, 203 Conn. 311–13, namely, where loss of consortium claims fit with respect to the "per person" or "per occurrence" limits of automobile liability policies, is misplaced.