MARIO FIALLO *v.* ALLSTATE
INSURANCE COMPANY
(AC 32766)

Beach, Alvord and Borden, Js.

Argued January 12—officially released October 2, 2012

*Jeremy C. Virgil,* for the appellant (plaintiff).

*Thomas A. Mulligan,* for the appellee (defendant).

BEACH, J. The plaintiff, Mario Fiallo, appeals from the judgment of the trial court denying his request to amend his complaint to add bad faith claims after a jury verdict in his favor and granting the motion of the defendant, Allstate Insurance Company, to subtract amounts from the jury verdict, as contemplated by the plaintiff's insurance policy, before rendering judgment. On appeal, the plaintiff claims that the court (1) applied the law erroneously in denying his request to amend his complaint and (2) erred in failing to find an ambiguity in the insurance policy. We affirm in part and reverse in part the judgment of the trial court.

The following facts set forth by the court in its September 23, 2010 memorandum of decision on postverdict motions are relevant to the plaintiff's appeal. "On July 24, 2006, the plaintiff, Mario Fiallo, was employed by Eagle Hill School in Fairfield as a maintenance worker. While he was engaged in yard work at the campus of Eagle Hill School he was struck by an automobile operated by Michelle Igesias and sustained injuries. Igesias was covered by an automobile liability insurance policy with $20,000 in policy limits. The plaintiff was paid the entire $20,000 under Igesias' policy and brought this action against [the] defendant, Allstate Insurance Company, pursuant to the underinsured motorists provision of a policy issued to the plaintiff by the defendant.

"The defendant filed an answer and special defenses claiming that its liability under the policy was limited to $50,000 and that, pursuant to the terms of the policy, it was entitled to credits equal to the amounts received by the plaintiff from Igesias and the amounts of benefits paid or payable by workers' compensation. A jury trial was conducted from May 25 to May 27, 2010, in Bridgeport Superior Court. On May 27, 2010, the jury returned

a verdict awarding the plaintiff [$95,000, which comprised] $30,287.14 in economic damages and $64,712.86 in noneconomic damages."

The jury had been instructed that its "only task [was] to determine whether the plaintiff sustained injuries as a result of the accident and, if so, what amount of money will fully and fairly compensate the plaintiff." The court found that "the parties had agreed to reserve all issues relating to reductions in underinsured motorists coverage under the provisions of [the] policy, including those which might otherwise [have] been submitted to the jury, for postverdict determination by the court."

On June 7, 2010, the defendant filed a motion to reduce the verdict to $0 in accordance with the plaintiff's insurance policy. On June 11, 2010, the plaintiff requested to amend his complaint "to conform [to] the evidence produced and discovered during trial and reflect the misconduct of the [d]efendant, Allstate by adding counts for breach of the covenant of good faith, breach of contract, violations of [the Connecticut Unfair Insurance Practices Act] CUIPA [General Statutes § 38a-815 et seq.] and violations of [the Connecticut Unfair Trade Practices Act] CUTPA [General Statutes § 42-110a et seq.]." The court denied the plaintiff's request, and the plaintiff thereafter filed motions to reargue and to reconsider, which also were denied. On September 23, 2010, the court granted in part the defendant's motion to reduce the verdict and reduced the judgment to $24,596.29. Judgment was rendered in that amount, and the plaintiff appealed to this court. Additional facts will be set forth as necessary.

I

The plaintiff first claims that the court erred in denying his request to amend his complaint to allege bad faith on the part of the insurer. He asserts two related

grounds for his claim: the court erred (1) in declining to allow new claims to be alleged after the jury returned its verdict and was dismissed, and (2) in predicting that his bad faith claims could be asserted in a separate action after the conclusion of the underlying action, if the claims were truly unknown prior to or during trial. We disagree.

The following additional facts are relevant. On June 11, 2010, the plaintiff filed a request for leave to amend his complaint "to conform [to] the evidence produced and discovered during trial and reflect the misconduct of the [d]efendant, Allstate by adding counts for breach of the covenant of good faith, breach of contract, violations of CUIPA and violations of CUTPA." In the five count proposed amended complaint, count one was identical to the original complaint. In counts two through five, the plaintiff claimed, inter alia, that the defendant "failed to investigate the value of the claim, failed to make a good faith effort to settle this claim, failed to disclose the basis for [its] refusal to negotiate the claim, and improperly refused to settle within the policy limits."

On June 22, 2010, the court heard argument on the request. Although the plaintiff asserted in his request to amend his complaint that the proposed amendment was filed, inter alia, so that the pleadings conformed to the evidence at trial, the court stated that the amended complaint set forth a new action that relied on "facts that were not shown at trial." The plaintiff acknowledged that the court was correct. The plaintiff argued that he was required, however, to raise the new claims in the present case because "the Supreme Court has said in multiple decisions . . . once a judgment has entered I'm estopped from pursuing a further action because all claims that could have been brought and . . . the facts underlying them didn't arise until the trial began . . . ." The plaintiff stated that he "had some

idea that [the misconduct that formed the basis of his additional claims] may have been occurring during the trial . . . ." The court stated: "I have trouble seeing your right to amend the complaint for . . . making a claim of fully defending themselves, albeit perhaps not successfully, who knows—I don't see that that amounts to bad faith and reverts back. I just don't see it. In any event, I think you're going to have to provide me with better authority before I would consider allowing the— a new case to be built based upon a postjudgment motion to amend a complaint. . . . [I]t does not make any sense to me. . . . Just because you can't bring another claim does not mean that you can do it in the fashion you're proposing to do it." The court informed the parties that it was not prepared to rule on the motion and set a date for another hearing in mid-July.

At the hearing on July 22, 2010, the plaintiff cited *Powell* v. *Infinity Ins. Co.*, 282 Conn. 594, 922 A.2d 1073 (2007), in support of his argument that he was required to amend his complaint to bring the bad faith claims in the present case so that he would not be barred by res judicata from bringing them in a later action. In *Powell*, the court held that res judicata barred the insured's claims of bad faith, breach of contract, violation of CUIPA and violation of CUTPA because they could have been brought in a prior action for uninsured motorist benefits. Id., 596. The court in the present case responded that "this *Powell* case may be distinguishable if the facts that gave rise to these new causes of action were unknown to you [and] did not arise in time for you to amend the complaint. What I need from you, before I can consider entertaining this, is some authority from some appellate court saying that after a cause of action is tried to a verdict, which has been accepted by the court, that there's authority to amend the complaint to add additional causes of action . . . ." The plaintiff cited *Landry* v. *Spitz*, 102 Conn.

App. 34, 925 A.2d 334 (2007), in support of his argument. The court distinguished *Landry* because in that case, although the plaintiff's complaint did not allege bad faith, it was actually litigated at trial; in the present case, bad faith was never litigated. The plaintiff informed the court that he had "suspicions going into the trial, as the trial began," about the bad faith, but that it did not "[crystallize] as being . . . bad faith conduct until after the trial . . . ." The court asked the plaintiff: "[C]an you point to any case in Connecticut that has been without agreement to bifurcate, or to separate causes of action or otherwise motions to sever parties, or sever causes of action, can you point to any case that has proceeded along the path that you're inviting this court to take?" The plaintiff did not provide any authority, but stated that he included in his reply brief cases that were bifurcated "because these are the types of issues that specifically should not be tried together."[1] The court stated that in those cases "bad faith was already in the case . . . ." The court denied the request for leave to amend the complaint.

We first set forth the applicable standard of review. "A trial court's ruling on a motion of a party to amend its complaint will be disturbed only on the showing of a clear abuse of discretion. . . . Whether to allow an amendment is a matter left to the sound discretion of the trial court. [An appellate] court will not disturb a trial court's ruling on a proposed amendment unless there has been a clear abuse of that discretion. . . . It is the [plaintiff's] burden . . . to demonstrate that the trial court clearly abused its discretion. . . . A trial court may allow, in its discretion, an amendment to pleadings before, during, or after trial to conform to

---

[1] The plaintiff maintains that there was a bifurcated trial in the present case. The court appears to have recognized that it was not a bifurcated trial, and, from the record, the action appears to have been tried to a jury, and certain issues were reserved for postverdict motions.

the proof. . . . Factors to be considered in passing on a motion to amend are the length of the delay, fairness to the opposing parties and the negligence, if any, of the party offering the amendment. . . . The essential tests are whether the ruling of the court will work an injustice to either the plaintiff or the defendant and whether the granting of the motion will unduly delay a trial." (Internal quotation marks omitted.) *Beckenstein* v. *Reid & Riege, P.C.*, 113 Conn. App. 428, 435–36, 967 A.2d 513 (2009).

The plaintiff argues that the court erred in determining that he could not amend his complaint after the jury verdict and before judgment was rendered on the verdict. Both parties agree that the standard of review is abuse of discretion. In light of the facts recounted previously, we do not conclude that the court abused its discretion in denying the plaintiff's request.

The court repeatedly requested authority from the plaintiff in support of his position and found that none was persuasive. The court examined *Powell* and opined that the plaintiff likely would not be barred from bringing a separate action if facts supporting bad faith were not known to him so that he could have amended his complaint in a timely manner. In *Powell*, our Supreme Court held that res judicata barred the plaintiffs' action alleging bad faith, breach of contract, violation of CUTPA and violation of CUIPA brought one year after judgment was rendered in an action against their insurer asserting claims brought pursuant to the uninsured motorist coverage of the automobile insurance policy. *Powell* v. *Infinity Ins. Co.*, supra, 282 Conn. 595–96. Our Supreme Court's reasoning in *Powell* is instructive. There, the plaintiffs brought the first action against their insurance company seeking payment for damages sustained by the plaintiffs that exceeded the tortfeasor's liability policy limit. The second action sought damages arising from their insurer's "bad faith" in processing

the first claim. The court held that both actions fundamentally arose from the insurer's alleged breach of its contractual obligation. Because the same transaction or series of transactions were implicated in both actions, they should both have been brought, if at all, together in one action. Although some of the evidence may not have been known until after commencement of the first action, the gravamen of the "bad faith" should have been known prior to the first trial.

An analogous situation arose in the present case. The first action alleged a breach of contract by failing to pay the damages due, which, were it not for an underinsured scenario, would have been paid by the tortfeasor's insurer. By agreement, the court tried the amount of the tortfeasor's liability to a jury, reserving the issue of deductions called for in the policy for later determination. Only after the insurer moved to reduce the judgment to nothing did the plaintiff seek to amend his complaint to allege bad faith. The facts alleged included the defendant's having undertaken "no discovery other than filing standard interrogatories," failure "to conduct a reasonable investigation," failure "to make any offer to settle this claim until immediately prior to trial," a pattern of unscrupulous business practices and a very low settlement offer just prior to trial. The plaintiff alleges that these acts occurred despite his expressed willingness to settle within the policy limits. These are the same kinds of facts that the court in *Powell* held were sufficiently known before trial to have been timely alleged.

The court in the present case, then, faced the discretionary decision of how to proceed when the plaintiff attempted to amend the complaint after a jury verdict but before the rendering of judgment. Delay, of course, was a significant factor weighing against allowing the amendment. The primary issue in the circumstances of this case was whether the ruling of the court would

work a substantial injustice to either party. The court appropriately grappled with the effects of *Powell* in its decision-making process.

The merits of the bad faith claims either could be reached or could not be reached in a second trial. If the merits could be reached, then the plaintiff would not be seriously prejudiced by the denial of the request for leave to amend in the first action, and there would be no unfairness at all. If the merits could not be reached in a second action, because of *Powell*, then serious unfairness would arise only if the plaintiff in fact had been unable to raise the claim in a more timely manner. The court in *Powell* noted that the bad faith claims stemmed from the same transaction as the straightforward uninsured/underinsured motorist claim; id., 604–605; both arose from the defendant's refusal to pay under the policy "despite its contractual obligations." Id., 606; see also *Duhaime* v. *American Reserve Life Ins. Co.*, 200 Conn. 360, 364–66, 511 A.2d 333 (1986) (discussing principles governing res judicata and holding CUTPA claim barred by res judicata when claim turned only on insurer's refusal to pay under policy). Critically, the plaintiffs in *Powell* argued that the bad faith action should not have been barred by res judicata partly because not all the facts were known at the time of the commencement of the first action. The trial court had recognized, however, that facts necessary for the claim were known at the time of such commencement, and it was inconsequential that additional evidence may have been discovered after commencement of the action, and the trial date could have been adjusted. *Powell* v. *Infinity Ins. Co.*, supra, 282 Conn. 608.

The trial court in the present case impliedly recognized that if the claims were subject to being barred in a second action on res judicata grounds, then they should have been seasonably raised in the first action. If the claims were not raised in a timely manner when they

should have been so raised, then there is no unfair prejudice in disallowing the amendment. If the claims could not have been timely raised, then they will not be barred, at least by the denial of the request for leave to amend the complaint, in a second action. It will be for the trial court in the second action to decide whether res judicata is a bar; we hold only that the trial court in this case did not abuse its discretion.[2]

## II

The plaintiff also claims that the court erred in failing to find an ambiguity in the language of the insurance

[2] We presume that the court considered the relevant factors. See *Przekopski* v. *Zoning Board of Appeals*, 131 Conn. App. 178, 195, 26 A.3d 657 ("The correctness of a judgment of a court of general jurisdiction is presumed in the absence of evidence to the contrary. We do not presume error. The burden is on the appellant to prove harmful error." [Internal quotation marks omitted.]), cert. denied, 302 Conn. 946, 30 A.3d 1 (2011); *Beckenstein Enterprises-Prestige Park, LLC* v. *Keller*, 115 Conn. App. 680, 691, 974 A.2d 764 (this court has "*never* found an abuse of discretion in denying an amendment on the eve of trial, long after the conclusion of pretrial proceedings" [emphasis added; internal quotation marks omitted]), cert. denied, 293 Conn. 916, 979 A.2d 488 (2009).

We note also that our Supreme Court has declined to find an abuse of discretion in the denial of a plaintiff's motion to amend his complaint brought eight days after a verdict in a trial in which the only issue was damages. *Leone* v. *Knighton*, 196 Conn. 494, 495–96, 493 A.2d 887 (1985). In *Leone*, the plaintiff sought to insert facts in his amended complaint to bring the case under a statute providing for double or treble damages and to strike all allegations of negligence inapplicable to that statute. Id., 495. Citing the wide discretion of trial courts in granting and denying amendments and reasoning that the plaintiff sought "totally to transform his cause of action after a jury verdict had already been returned," the Supreme Court did not find abuse of discretion in the trial court's denial of the motion. Id., 496.

This court has also declined to find an abuse of discretion in a trial court's decision to permit an amendment to the complaint after the granting of a directed verdict. *Burton* v. *Stamford*, 115 Conn. App. 47, 971 A.2d 739, cert. denied, 293 Conn. 912, 978 A.2d 1108 (2009). The court in *Burton* stated that a trial court may allow amendment to a complaint after verdict or judgment, but the granting of such a motion depends on the particular circumstances of the case. Id., 59. As discussed previously, the particular circumstances of this case do not demonstrate that denying the plaintiff's request for leave to amend his complaint after the jury verdict was an abuse of discretion.

policy, including the declarations page.[3] We agree and remand the case to the trial court for further proceedings.

The following additional facts are relevant. The plaintiff's automobile insurance policy was introduced as an exhibit at a postverdict hearing. Each declaration page for each of the three vehicles for which the plaintiff was insured included a column entitled "COVERAGE." Under that column, one of the rows read in its entirety, "Uninsured/Underinsured Motorists," and reflected a policy limit of $50,000 per person and $100,000 per accident.[4]

Part V of the policy was entitled "Uninsured Motorist Insurance Underinsured Motorist Insurance Coverage SS." It provided in relevant part: "If a premium is shown on the declarations page for Coverage SS, Uninsured Motorist Insurance and Underinsured Motorist Insurance, we will pay those damages which an insured person is legally entitled to recover from the owner or operator of an uninsured auto or underinsured auto because of bodily injury sustained by an insured person." Part V additionally provided: "The *limits of this coverage will be reduced* by: 1. all amounts paid by or on behalf of the owner or operator of the uninsured auto or underinsured auto . . . . 2. all amounts paid or payable under any worker's compensation law . . . ." (Emphasis added.)

---

[3] The declarations page "is regarded as part of the insurance contract . . . and contains the terms most likely to have been requested by the insured . . . ." 16 S. Williston, Contracts (4th Ed. Lord 2000) § 49:25, p. 139.

[4] The policy provided: "The coverage limit shown on the Policy Declarations for:

"1. 'each person' is the most that we will pay for damages arising out of bodily injury to one person in any one motor vehicle accident. . . .

"2. 'each accident' is the most that we will pay for damages arising out of bodily injury to two or more persons in any one motor vehicle accident."

Part VI of the policy was entitled "Uninsured Motorist Insurance Underinsured Motorist Conversion Insurance Coverage SC." It provided in relevant part: "If a premium is shown on the declarations page for Coverage SC, Uninsured Motorist Insurance and Underinsured Motorist Conversion Insurance, we will pay those damages which an insured person is legally entitled to recover from the owner or operator of an uninsured auto or underinsured auto because of bodily injury sustained by an insured person." Part VI additionally provided: "In the case of accidents involving a legally liable underinsured motorist, the *damages payable will be reduced* by: 1. all amounts paid by or on behalf of the owner or operator of the underinsured auto . . . . 2. all amounts paid or payable under any worker's compensation law . . . ." (Emphasis added.)

Under part V of the policy, the limits of the coverage are reduced by the amount recovered from the tortfeasor's insurer.[5] In the present case, if part V applied, the limits of the coverage would be reduced to $30,000, which is $20,000, the amount recovered from Igesias' insurer, subtracted from $50,000, the limit provided for on the declarations page. Under part VI of the policy, the damages payable are to be reduced by the amount recovered from the tortfeasor's insurer. In the present case, if part VI applied, the damages payable would be reduced to $75,000, which is $20,000, the amount recovered from Igesias' insurer, subtracted from $95,000, the full award of damages. The amount of the judgment would, of course, be subject to any other deduction and additionally subject to the policy limit of $50,000.

The court rejected the plaintiff's argument that an ambiguity existed in the policy because of the failure

[5] In order to recover uninsured/underinsured benefits, of course, the tortfeasor's liability policy must be exhausted.

of the declarations page to specify code "SS" or code "SC." The court found: "There is nothing on the declaration[s] page to suggest that conversion coverage was being provided by the defendant. Under these circumstances, the court finds no ambiguity in the policy and finds that the plaintiff is entitled to coverage afforded under part V of the policy and [is] not entitled to coverage under part VI of the policy."

We first set forth the applicable standard of review. "[A]n insurance policy is a contract that is construed to effectuate the intent of the parties as expressed by their words and purposes. . . . [U]nambiguous terms are to be given their plain and ordinary meaning. . . . As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading. . . . The determination of whether an insurance policy is ambiguous is a matter of law for the court to decide." (Citations omitted; internal quotation marks omitted.) *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, 255 Conn. 295, 305–306, 765 A.2d 891 (2001). It is a "basic principle of insurance law that policy language will be construed as laymen would understand it and not according to the interpretation of sophisticated underwriters . . . ." *Cody* v. *Remington Electric Shavers*, 179 Conn. 494, 497, 427 A.2d 810 (1980).

The plaintiff argues that, because the declarations page failed to state "Coverage SS" or "Coverage SC," the policy is ambiguous and should be construed in his favor. The policy provides: "A Coverage applies only when a premium for it is shown on the declarations page." Both part V and part VI of the policy provide that the insurer will pay damages "[i]f a premium is shown on the declarations page for Coverage [SS in part V or SC in part VI]." The declarations page expressly states coverage for "Uninsured/Underinsured

Motorists." Part V is entitled "Uninsured Motorist Insurance Underinsured Motorist Insurance Coverage SS." Part VI is entitled "Uninsured Motorist Insurance Underinsured Motorist Conversion Insurance Coverage SC." Applying a layperson standard, a reader cannot clearly discern to which type of insurance "Uninsured/Underinsured Motorists" refers. The only three words that appear on the declarations page are "Uninsured/Underinsured Motorists," all of which appear in both coverage options. The language used on the declarations page is reasonably susceptible to more than one reading, i.e., "Uninsured/Underinsured Motorists" could refer either to uninsured/underinsured motorist insurance coverage or uninsured/underinsured motorist conversion insurance coverage.[6] Coverage pursuant to either part V or part VI is uninsured/underinsured motorist coverage.

Having found an ambiguity in the language, we next determine how to resolve it. As our Supreme Court has stated, "Ordinarily, if an ambiguity arises that cannot be resolved by examining the parties' intentions . . . the ambiguous language should be construed in accordance with the reasonable expectations of the insured when he entered into the contract. . . . Courts in such situations often apply the contra proferentem rule and interpret a policy against the insurer." (Citation omitted; internal quotation marks omitted.) *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, supra, 255

---

[6] In support of its position, the defendant relies on *Herrick* v. *Bordonaro*, Superior Court, judicial district of Litchfield, Docket No. CV-06-5001420-S (October 17, 2008) (46 Conn. L. Rptr. 402), and *Carron* v. *Allstate Ins. Co.*, Superior Court, judicial district of Ansonia-Milford, Docket No. CV-06-5001037 (March 26, 2008). In both cases, the court concluded that the applicable Allstate policy was unambiguous and that the phrase "Uninsured/Underinsured Motorists" on the declarations page clearly did not refer to conversion coverage because the word "conversion" did not appear on the page. These decisions are not binding on this court, and we respectfully disagree with them for the reasons stated previously.

Conn. 306. In the present case, however, the issue of whether the plaintiff purchased standard uninsured/underinsured motorist coverage or uninsured/underinsured motorist conversion coverage presents a question of historical fact, rather than one of contract construction. Accordingly, the canon of contra proferentem[7] need not be applied automatically. See 2 S. Plitt, D. Maldonado & J. Rogers, Couch on Insurance (3d Ed. Rev. 2010) § 22:16, pp. 22-93–22-94 ("since rule of strict construction of an ambiguous policy against insurer is a rule of last resort, and not to be permitted to frustrate parties' expressed intention if such intention could be otherwise ascertained, where there is extrinsic evidence of parties' intention, which is proferred and admissible, and which resolved ambiguity, albeit in favor of noncoverage, the rule of strict construction need not be applied"); cf. 1 New Appleman on Insurance Law, Library Edition (J. Thomas & F. Mootz III eds., 2011) § 5:04 [3] [a] [iii], p. 5-37 ("[r]eliance on extrinsic evidence . . . is not the norm because the *contra proferentem* doctrine allows a court to construe the policy without reference to such evidence" [emphasis in original]). The issue in the present case does not require an interpretation of a policy term that is written by the insurer; see *Connecticut Ins. Guaranty Assn.* v. *Fontaine*, 278 Conn. 779, 789 n.7, 900 A.2d 18 (2006) ("The premise behind the rule [of contra proferentem] is simple. The party who actually does the writing of an instrument will presumably be guided by his own interests and goals in the transaction. He may choose shadings of expression, words more specific or more imprecise, according to the dictates of these interests. . . . A further, related rationale for the rule is that [s]ince one who speaks or writes, can by exactness of expression

---

[7] "Contra proferentem" is a principle of construction according to which ambiguities will be construed against the party who drafted the document. See 11 S. Williston, Contracts (4th Ed. Lord 1999) § 32:12.

more easily prevent mistakes in meaning, than one with whom he is dealing, doubts arising from ambiguity are resolved in favor of the latter." [Internal quotation marks omitted.]); but rather warrants an inquiry into the circumstances of the purchase of the policy to determine which variety of uninsured/underinsured motorist coverage the plaintiff opted to purchase so that the intentions of the parties may be discovered and put into effect.

The determination of what policy was bought may be resolved by examining extrinsic evidence. "If the policy is ambiguous, extrinsic evidence may be introduced to support a particular interpretation. . . . If the extrinsic evidence presents issues of credibility or a choice among reasonable inferences, the decision on the intent of the parties is a job for the trier of fact." (Citation omitted; internal quotation marks omitted.) *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, supra, 255 Conn. 306;[8] see also *Hartford Accident & Indemnity Co.* v. *Ace American Reinsurance Co.*, 284 Conn. 744, 771, 936 A.2d 224 (2007) ("extrinsic evidence may be considered in determining contractual intent only if a contract is ambiguous"); M. Taylor, K. Dowd & B. Levesque, Connecticut Insurance Law (2011) § 2-5:1, p. 35 ("[o]nce a determination is made that the policy is ambiguous, then the court may consider any relevant evidence which demonstrates the intent of the parties at the time that they entered into the policy"). Because the reasonable expectations of the insured control

---

[8] In *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, supra, 255 Conn. 306, our Supreme Court analyzed the scope of the "per occurrence" limit of liability under excess insurance policies issued by the defendant health insurers to the plaintiff. The court analyzed the language of the policies and held that they were not ambiguous. Id., 306–307. The court noted that even if it found an ambiguity, the contra proferentem rule would not apply because the rule is inapplicable in actions brought by one insurer against another. Id., 329. That proviso, of course, does not specifically apply in the context of this case.

when enforcing insurance contracts; *Ceci* v. *National Indemnity Co.*, 225 Conn. 165, 175 n.6, 622 A.2d 545 (1993); we conclude that the process best suited to effectuate the intent of the parties where the language is ambiguous as to the issue of historical fact whether the insured elected to buy a particular policy is to examine extrinsic evidence to determine the parties' intentions, and if this examination does not resolve the question, other canons of construction, including perhaps the doctrine of contra proferentem, may be applied. There is a fundamental distinction between deciding what policy language means, on the one hand, and deciding, on the other hand, whether a particular policy option was bought.

Under different circumstances, our Supreme Court has examined extrinsic evidence in resolving an ambiguity in an insurance policy. In *Connecticut Ins. Guaranty Assn.* v. *Fontaine*, supra, 278 Conn. 779, our Supreme Court analyzed whether the phrase "because of bodily injury" was ambiguous with respect to a claim for loss of consortium where the insurer had "agree[d] with the named insured to pay on behalf of the insured all sums which the insured shall be legally obligated to pay as damage because of bodily injury or property damage to which this insurance applies caused by a medical incident . . . ." (Internal quotation marks omitted.) Id., 786. The court examined the dictionary definition of "because of" and concluded that the policy was ambiguous because two reasonable meanings existed: the phrase could limit the insurer's obligation to pay damages caused only by direct injury to the body of the injured individual or the phrase could encompass claims such as loss of consortium that are derivative of bodily injury. Id., 787. The court then stated: "Thus, having concluded that the relevant policy language is ambiguous, we ordinarily would be free to consider extrinsic evidence, although [i]f the extrinsic evidence

presents issues of credibility or a choice among reasonable inferences, the decision on the intent of the parties is a job for the trier of fact." (Internal quotation marks omitted.) Id., 788. The court concluded, however, that extrinsic evidence was not applicable because the case was before the Supreme Court and the trial court on a statement of stipulated facts, and, thus, the Supreme Court applied contra proferentem to hold that the policy covered loss of consortium claims. Id., 788–89; see 2 S. Plitt, D. Maldonado & J. Rogers, supra, § 22:22 ("[s]ome of the cases which do not follow the rule that insurance policy will be construed against insurer actually appear to apply the rule at a different point in the analytical process, following a procedure of ascertaining the intention of parties from the policy as a whole, considering extrinsic and parol evidence to construe any ambiguity, and then, only if ambiguity still remains after the examination of such evidence, construing the policy against the insurer").

In *Connecticut Ins. Guaranty Assn.*, the issue was the determination of the meaning of a particular phrase in the policy language, whereas the issue before this court in the present case is the determination of a historical fact, to wit, which type of uninsured/underinsured motorist insurance coverage the plaintiff selected for purchase. Although this distinction, and the fact that the case in *Connecticut Ins. Guaranty Assn.* was before the court on a set of stipulated facts, distinguishes the two cases, the framing of the analysis upon determining that there was an ambiguity is instructive. The court in *Connecticut Ins. Guaranty Assn.* wrote: "Thus, having concluded that the relevant policy language is ambiguous, we ordinarily would be free to consider extrinsic evidence, although [i]f the extrinsic evidence presents issues of credibility or a choice among reasonable inferences, the decision on the intent of the parties is a job for the trier of fact." (Internal quotation marks omitted.)

*Connecticut Ins. Guaranty Assn.* v. *Fontaine,* supra, 278 Conn. 788. The court acknowledged that, upon concluding that policy language is ambiguous, a court may admit extrinsic evidence to resolve the ambiguity, rather than apply contra proferentem automatically. In the present case, the intentions of the parties as to which plan of uninsured/underinsured motorist insurance coverage was chosen cannot be determined from the policy; accordingly, extrinsic evidence is appropriate.

Our search of the case law has not yielded cases within our jurisdiction that have addressed the issue of resolving an ambiguity as to which particular option was selected for purchase in an insurance policy.[9] There are, however, cases from other jurisdictions that have addressed analogous situations.

In *General Star Indemnity Co.* v. *Custom Editions Upholstery Corp.,* 940 F. Supp. 645 (S.D.N.Y. 1996), the plaintiff insured two defendant corporations against fire. There was a fire on the defendants' premises, and the defendant Custom Editions' customers filed claims totaling $85,545.12 for personal property on the premises at the time of the fire. Id., 648. The plaintiff interpreted the relevant insurance policy to cover no more than $2500 to Custom Editions' customers. Id. The policy provided that the insurer would pay for loss of or damage to any "Covered Property," which was defined as "the following types of property for which a [l]imit of [i]nsurance is shown in the [d]eclarations." (Internal quotation marks omitted.) Id., 653. The policy also defined three kinds of property that may be covered: "Building," "Your Business Personal Property" and "Personal Property of Others." (Internal quotation marks omitted.) Id. The declarations page showed coverage for "Building," "Contents" and "Bus Income."

---

[9] See footnote 6 of this opinion. The cases cited by the defendant concluded that there was not an ambiguity.

(Internal quotation marks omitted.) Id., 654. A section of the policy entitled "Coverage Extensions," provided: "You may extend the insurance that applies to *Your Business Personal Property* to apply to . . . (2) Personal Property of others in your care, custody or control. The most we will pay for loss or damage under this Extension is $2,500 for each described premises." (Emphasis added; internal quotation marks omitted.) Id. The customer claimants argued that the personal property of individuals within the custody of the defendant insured was covered on the basis of the word "Contents" on the declarations page. (Internal quotation marks omitted.) Id. The claimants asserted that the term "Contents" was not limited to "Business Personal Property," and, thus, did not exclude "Personal Property of Others." (Internal quotation marks omitted.) Id. The plaintiff argued that "Contents" included "Business Personal Property" only and that had Custom Editions requested coverage for the personal property of others, such coverage would have been itemized separately on the declarations page. (Internal quotation marks omitted.) Id.

The court began its analysis by noting: "An insurance contract, like any other, must be construed to effect the intent of the parties as expressed by their words and purposes." Id. The court stated that, in the event of an ambiguity, the parties may introduce extrinsic evidence. Id. "If the extrinsic evidence does not yield a conclusive answer as to the parties' intent, it is appropriate for a court to resort to other rules of construction, including the contra-insurer rule, which states that any ambiguity in an insurance policy should be resolved in favor of the insured." (Internal quotation marks omitted.) Id., 655. The court concluded that the policy was ambiguous. The use of the word "Contents" on the declarations page was reasonably susceptible to more

than one meaning, i.e., it could encompass both "Business Personal Property" and "Personal Property of Others," or it could not encompass both types of coverage because the declarations page did not itemize them separately. (Internal quotation marks omitted.) Id. The court then examined the plaintiff's extrinsic evidence—an interview with the owner of Custom Editions, the policy application and sworn testimony of its underwriter—and concluded that such evidence did not eliminate the ambiguity. Id. "When extrinsic evidence fails to resolve the ambiguity in the policy, the contra-insurer rule—i.e., all ambiguities in a policy must be interpreted against the insurer—must be applied, and the ambiguous clause must be interpreted in favor of the insured." Id., 656. Accordingly, the court concluded that the policy included coverage for "Personal Property of Others." (Internal quotation marks omitted.) Id.; but see *Simon* v. *Continental Ins. Co.*, 724 S.W.2d 210 (Ky. 1986) (where declarations page indicated insured purchased underinsured motorist insurance and uninsured coverage but failed to specify separate coverage amount for underinsured coverage or itemize separate premiums, ambiguity was present and insured entitled to have ambiguity resolved against insurer).

In the present case, as in *General Star Indemnity Co.*, there is an issue as to which coverage was selected for purchase. The court in *General Star Indemnity Co.* looked to extrinsic evidence to resolve the ambiguity first before applying the doctrine of contra proferentem. In the present case, it is unclear which coverage—standard uninsured/underinsured coverage or uninsured/underinsured conversion coverage—the plaintiff selected. Accordingly, extrinsic evidence, such as any relevant testimony and the policy application, may be admitted by the trial court to resolve the ambiguity.[10]

---

[10] The trial court in the present case concluded that there was no ambiguity, although it did hear extrinsic evidence. The court heard the testimony of an employee of the defendant regarding the policy language and the defendant's

In *East Troy* v. *St. Paul Fire & Marine Ins. Co.*, Wisconsin Court of Appeals, Docket No. 96-2501 (August 13, 1997) (unpublished), the defendant issued umbrella liability policies to the "Township of East Troy-Water Distribution Department." The plaintiff sought defense and indemnification for its remediation work at a landfill site unrelated to water distribution. The trial court concluded that the coverage under the insurance policies was limited to water distribution operations and did not cover the work at the landfill site, and, accordingly, granted the defendant's motion for summary judgment. The appellate court affirmed. It concluded that the identity of the named insured was ambiguous. The court explained that where there is an ambiguity in a contract, it may consider extrinsic evidence of the parties' intent. See *Grange Mutual Casualty Co.* v. *Snipes*, 298 Ga. App. 405, 407–409, 680 S.E.2d 438 (2009) (examining extrinsic evidence to resolve ambiguity as to identity of insured when certificate of insurance named "Savannah Sugar Refinery" as holder of certificate of insurance while endorsements on renewal policy named "Imperial-Savannah & Industries, Inc.," as additional insured); 2 S. Plitt, D. Maldonado & J. Rogers, supra, § 22:14 (contra proferentem does not apply in determining whether particular party is an insured). The court considered extrinsic evidence and concluded that such evidence made apparent that the policies were intended to insure risks associated with water distribution work only.

As in *East Troy*, the issue in the present case called for a factual determination rather than a construction of the terms of the policy drafted by the insurer. The

internal procedures used to produce the language regarding coverages reflected on the declarations page. Her testimony implied that, according to the defendant, the language of the declarations page circumstantially indicated that the plaintiff did not have conversion coverage. No other evidence, such as a copy of the application, was submitted.

court in *East Troy* concluded that the trial court was properly assisted by extrinsic evidence in determining the identity of the named insured. In the present case, extrinsic evidence regarding the circumstances of the plaintiff's selection of uninsured/underinsured motorist coverage would likely be helpful in resolving the ambiguity as to which variety of coverage he chose.

The court here did not make a finding regarding the parties' intentions other than its conclusion that the policy and declarations page were unambiguous. As discussed previously, we conclude that there is an ambiguity. Accordingly, we conclude that the court should engage in fact-finding as to the intent of the parties; see M. Taylor, K. Dowd & B. Levesque, supra, § 2-4:2 ("[a] finding of ambiguity permits the use of extrinsic evidence that normally would be precluded by the parol evidence rule, which provides that generally, when there is a written agreement, no other evidence will be considered on the terms of that agreement"); and we reverse the judgment in part and remand the case to the court to determine which coverage the parties intended.[11]

The judgment is reversed only as to the granting of the motion to reduce the jury verdict and the case is remanded for further proceedings consistent with this opinion. The judgment is affirmed in all other respects.

In this opinion ALVORD, J., concurred.

BORDEN, J., concurring. I agree with and join the well reasoned opinion of the majority, with two minor

---

[11] The concurrence suggests that on remand, the burden of proof should be shifted to the defendant. We respectfully disagree. On the facts of this case, of course, if no evidence other than the policy, including the declarations page, is introduced on remand, then, consonant with the authority previously cited, the plaintiff presumably would prevail by the application of contra proferentem. The plaintiff would prevail, however, not because the burden of proof has been shifted but rather because it has been satisfied.

linguistic exceptions, which I will discuss. I write sepa-rately only to give the trial court some guidance for its determinations on remand.

First, I take issue with the following language in part II of the majority opinion: "The issue in the present case does not require an interpretation of a policy term that is written by the insurer . . . ." (Citation omitted.) I also take issue with the following similar language in part II of the majority opinion: "There is a fundamental distinction between deciding what policy language means, on the one hand, and deciding, on the other hand, whether a particular policy option was bought." That may or may not be so. In a case such as this, if there is no persuasive extrinsic evidence that resolves the question of what kind of coverage the plaintiff, Mario Fiallo, purchased, in my view "what [the] policy language means" will determine what policy was bought. In other words, the question is not "what policy option was bought," but what coverage was provided by the policy that the plaintiff bought, and that question has to be decided by, first, deciding whether the policy language was ambiguous and, second, if so, whether there is persuasive extrinsic evidence that overcomes the contra proferentem rule.

This brings me to what I regard as some further guidance for the trial court on the remand. In my view, the defendant, Allstate Insurance Company, should have the burden of proof on the question of whether the coverage was straight uninsured and underinsured, as the defendant claims, or conversion coverage, as the plaintiff claims. This is because, consistent with the policy underlying the contra proferentem rule, the defendant had the best opportunity to make that clear in its policy papers, including the application. Further-more, in the trial court, the defendant had the opportu-nity to bring forth extrinsic evidence to show the

parties' intentions, and the only evidence that it produced was the testimony of an underwriter, which I will discuss, and which did not shed any persuasive light on the factual issue involved. This means that if the defendant does not carry its burden of proof on this issue, the court should apply the contra proferentem rule and, consistent with the majority's conclusion that the policy is ambiguous, construe it as a matter of the parties' intentions against the defendant and in favor of the plaintiff.

One final word about what evidence may or may not suffice on the remand. As the majority rightly states: It is a "basic principle of insurance law that policy language will be construed as laymen would understand it and not according to the interpretation of sophisticated underwriters . . . ." *Cody* v. *Remington Electric Shavers*, 179 Conn. 494, 497, 427 A.2d 810 (1980). The same principle should apply when applying extrinsic evidence to illuminate the meaning of policy language; when applying that extrinsic evidence, the court as fact finder should construe the language, in light of that application, as laymen would understand that language.

In the present case, the only evidence adduced by the defendant in the postverdict hearing held by the court on the coverage issue was testimony by an underwriter for the defendant regarding the function and meaning—as an internal coding matter—of the terms "Coverage SS" and "Coverage SC" generally within the defendant company. Indeed, she did not even relate that testimony to the specific policy purchased by the plaintiff. My point here is that extrinsic evidence such as this would be wholly unhelpful in resolving the question of what coverage the plaintiff purchased from the defendant. Put another way, no reasonable fact finder could rely on it to construe the meaning of the ambiguous language of the policy. Only evidence communicated to the plaintiff and bearing on what the plaintiff,

as a layman unschooled in the inner workings of the defendant and its coding operations would understand, would be persuasive to resolve the factual question remaining to be determined on the remand.