CHICAGO TITLE INSURANCE COMPANY *v.* BRISTOL HEIGHTS ASSOCIATES, LLC, ET AL.
(AC 34040)

Beach, Espinosa and Dupont, Js.*

---

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

Argued November 14, 2012—officially released May 7, 2013

*Jeffrey J. Tinley*, with whom, on the brief, was *William F. Gallagher*, for the appellant (named defendant).

*Christopher F. Girard*, with whom was *Edward V. O'Hanlan*, for the appellee (plaintiff).

*Opinion*

ESPINOSA, J. The defendant Bristol Heights Associates, LLC,[1] appeals from the judgment of the trial court rendered in favor of the plaintiff, Chicago Title Insurance Company, in connection with the underlying civil action in which the plaintiff sought a declaratory judgment to determine its obligations under a title insurance policy (policy) issued to the defendant for real property located near Daniel Road and Kingswood Drive in the city of Bristol (property).[2] The defendant claims that the trial court improperly (1) found that the defendant breached the policy by failing to cooperate with the plaintiff's coverage investigation, thereby prejudicing the plaintiff; (2) found that the defendant's payment under protest of the tax lien on the property was voluntary, such that it violated the policy and prejudiced the plaintiff; (3) found that the plaintiff was relieved of its coverage obligation to the defendant when the plaintiff's right of subrogation was unimpaired; and (4) refused to consider evidence supporting the defendant's claim that the plaintiff acted in bad faith.[3] We affirm the judgment of the trial court.

[1] Lew J. Volpicella was named as a defendant in the underlying civil action, but is not a subject of this appeal. We therefore refer in this opinion to Bristol Heights Associates, LLC, as the defendant.

[2] The defendant on appeal also challenges the trial court's denial of its September 29, 2011 motion to reargue and for reconsideration of the memorandum of decision issued in connection with the court's August 18, 2011 judgment. The defendant, however, failed to brief any argument specifically related to that motion. Accordingly, the defendant has abandoned any claim related to that motion. See *Harris* v. *Bradley Memorial Hospital & Health Center, Inc.*, 306 Conn. 304, 319, 50 A.3d 841 (2012) ("[a]n appellant who fails to brief a claim abandons it" [internal quotation marks omitted]).

[3] In a separately enumerated claim, the defendant also asserts that the court failed to apply the controlling law related to the construction of insurance policies and failed to acknowledge several material policy provisions. The substance of this claim, however, appears to be merely an overview of the issues on appeal. Accordingly, the analysis of the other claims set forth in this opinion provides an adequate basis for the resolution of this claim. We, therefore, need not discuss it separately.

The following facts as found by the court and procedural history of the case are relevant to our resolution of this appeal. On May 25, 1994, Lew J. Volpicella purchased the property involved in the underlying action and received a quitclaim deed from PB Real Estate, Inc. (PB Real Estate). At the time of the purchase, the property was a single parcel of land. Formerly, the property had been subdivided into 147 lots. The subdivision expired on March 3, 1993. The city of Bristol (city) never sent a bill to Volpicella for taxes due on the October 1, 1993 grand list. The payments due from Volpicella for the July, 1994 and January, 1995 installments of that tax went unpaid. On May 31, 1995, the city recorded tax liens for the October 1, 1993 grand list under PB Real Estate; the liens were filed individually against the 147 lots even though the property was a single parcel as of March 3, 1993. The city gave notice of the liens to PB Real Estate, but not to Volpicella. Volpicella paid the taxes on the property for the grand lists after 1993, and no overdue balance was reflected on any of the bills that he received. The city failed to apply any of Volpicella's subsequent tax payments to the oldest, past due balance that it claimed was due from the 1993 grand list.

Volpicella entered into an agreement with the defendant in which he became a member of the defendant and conveyed the property to the defendant. Volpicella conveyed the property by way of a warranty deed dated April 2, 2003, which was subsequently recorded on May 8, 2003. The deed contained no exception for the tax liens on the 1993 grand list. Volpicella was given an unsecured promissory note for $800,000 as the consideration for the conveyance. At the time of the transfer of the property, the defendant purchased from the plaintiff the policy, which insured title to the property. The defendant's attorney, Richard P. Kuzmak, served as the plaintiff's issuing agent with respect to the policy. When

Kuzmak performed a title search on the property, he did not locate the city's tax liens against the property because they were filed against the subdivided lots owned by PB Real Estate, not Volpicella.

On August 16, 2005, the defendant received a demand from the city for payment of the 1993 taxes. The defendant never notified Volpicella that it was asserting any claim against his warranty deed, and it did not request that he pay the tax liens. On September 1, 2005, Kuzmak wrote a letter to one of the plaintiff's attorneys, Phillip Fanning, regarding the receipt of the tax lien, in which he requested a meeting. In a meeting on October 27, 2005, Kuzmak requested that Fanning and the plaintiff not do anything about the liens because the money the defendant owed Volpicella under the promissory note exceeded the amount of the tax lien and because the validity of the tax liens was in question. Fanning did not believe that the meeting was related to a claim by the defendant under the policy, but rather believed it was for the purpose of discussing the title issue that had arisen.

Kuzmak also notified Volpicella's attorney, James Ziogas, that he knew the liens violated a covenant in the warranty deed. The defendant believed that the legitimate tax liability on the property was $11,000 and that, due to the covenants of the warranty deed from Volpicella, the tax liability was his responsibility. In the fall of 2005, Kuzmak, Ziogas and members of the defendant met with city officials in an effort to resolve or compromise the liens with the city. They ultimately were unable to resolve or compromise the liens. No request was ever made for Fanning to participate in any meeting or telephone call between the defendant, its representatives and the city.

In late 2005, the defendant began to refinance the debt related to the property. A mortgage related to these

efforts, which was secured by the property, was due to be repaid on February 26, 2006. During this time, the defendant did not provide any information to Fanning or the plaintiff about any potential refinancing, and it did not request that the plaintiff issue a new policy to insure over the lien to facilitate the refinance. The plaintiff acknowledged receipt of a title claim from the defendant on December 27, 2005, in response to a letter sent by Kuzmak to the plaintiff's claims office. The plaintiff assigned the claim to attorney Norma B. Levy for investigation. In late December, 2005, or early January, 2006, Kuzmak sent a letter to the plaintiff advising that the city was considering referring the tax liens on the property to corporation counsel for the collection of the tax.

Levy immediately investigated whether the liens were valid, whether there were viable defenses to the city's threatened claims and whether the liens were covered under the policy. At the request of Levy, Kuzmak performed a legal analysis regarding the validity of the liens, the results of which indicated that the proper assessment of the property would have produced a substantially smaller amount of tax. Levy believed that there were viable defenses to any action initiated by the city. While conducting her investigation, Levy obtained three extensions of time before the city would refer the matter to outside counsel to initiate collection efforts so that the plaintiff could continue to investigate the claim. The tax collector never indicated that the city was going to commence a foreclosure action.

On March 8, 2006, the defendant paid the tax liens on the property in full. As of that date, the city had not initiated a foreclosure action or referred the matter to outside counsel for collection. At trial, it was stipulated that the defendant did not notify the plaintiff or obtain its consent prior to paying the liens.

The plaintiff filed the operative revised complaint in the underlying action on May 30, 2007. In the complaint, the plaintiff sought a declaratory judgment that (1) the defendant's coverage under the policy was precluded due to the defendant's prior knowledge of the tax liens when it took title to the property; (2) the defendant's coverage under the policy was precluded because the defendant suffered no loss by paying the taxes when it owed Volpicella $800,000 on the promissory note; (3) the defendant's voluntary payment of the taxes excluded coverage under the policy pursuant to subsection 9 (c)[4] of the conditions and stipulations section of the policy; (4) the plaintiff's obligations under the policy were terminated due to the defendant's breach of its duty to cooperate under sections 4 and 5[5] of the conditions and stipulations in the policy; and (5) the defendant breached the implied duty of good faith and fair dealing inherent in their contractual relationship.[6] The

---

[4] Section 9 (c) of the conditions and stipulations section of the policy states: "The [plaintiff] shall not be liable for loss or damage to any insured for liability voluntarily assumed by the insured in settling any claim or suit without the prior written consent of the [plaintiff]."

[5] Section 5 of the conditions and stipulations section of the policy is entitled "Proof of Loss or Damage" and states in relevant part: "[T]he insured claimant may reasonably be required to submit to examination under oath by any authorized representative of the [plaintiff] and shall produce for examination, inspection and copying, at such reasonable times and places as may be designated by any authorized representative of the [plaintiff], all records, books, ledgers, checks, correspondence and memoranda, whether bearing a date before or after [d]ate of [p]olicy, which reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the [plaintiff], the insured claimant shall grant its permission, in writing, for any authorized representative of the [plaintiff] to examine, inspect and copy all records, books, ledgers, checks, correspondence and memoranda in the custody or control of a third party, which reasonably pertains to the loss or damage. . . . Failure of the insured claimant to submit for examination under oath, produce other reasonably requested information or grant permission to secure reasonably necessary information from third parties as required in this paragraph shall terminate any liability of the [plaintiff] under this policy as to that claim."

[6] In the sixth count of the complaint, the plaintiff sought an alternative declaratory judgment that, if it was found liable to indemnify the defendant

defendant filed a counterclaim alleging breach of contract, breach of the covenant of good faith and fair dealing, and a violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.

On December 30, 2009, the court, *Hon. Joseph M. Shortall*, judge trial referee, granted a motion for summary judgment filed by the plaintiff regarding the defendant's bad faith and CUTPA claims, leaving the defendant's breach of contract count as the only remaining counterclaim to be resolved at trial. On February 2, 2009, the defendant withdrew all three counts of its counterclaim. On September 8, 2010, the court granted the plaintiff's motion to restore to the docket the defendant's withdrawn counterclaim for breach of contract, "subject to all relevant rulings of the court prior to, and following, its withdrawal on February 2, 2010 (# 218.50)."

On August 18, 2011, the court rendered judgment in favor of the defendant as to count one of the plaintiff's revised complaint regarding the defendant's prior knowledge of the taxes, count two regarding the loss suffered by the defendant and count five regarding the defendant's alleged bad faith. The court rendered judgment in favor of the plaintiff as to count three regarding the defendant's voluntary payment, count four regarding the defendant's breach of the duty to cooperate under section 5 of the conditions and stipulations[7] in the policy and the defendant's counterclaim. The present appeal followed. Additional facts will be set forth as necessary.

under the policy, Volpicella should be required to indemnify the plaintiff for the amount of any loss paid by the plaintiff to the defendant. Because the court did not find the plaintiff liable to indemnify the defendant under the policy, the court declined to address the claims raised in this count.

[7] The court found that the defendant did not breach its duty under section 4 of the conditions and stipulations section of the policy. Therefore, section 4 is not at issue in this appeal.

# I

The defendant raises several claims related to the court's finding that it breached the policy by failing to cooperate with the plaintiff's coverage investigation, thereby prejudicing the plaintiff. Specifically, the defendant claims that the applicable policy provision, from which its duty to cooperate was derived, required it to cooperate with the plaintiff for matters related only to the proof of loss or damage. The defendant claims that the plaintiff's requests with which the court found it did not comply did not relate to the proof of loss or damage but, rather, were intended to aid the plaintiff's noncontractual purposes of vitiating coverage and obtaining support for defenses to the plaintiff's coverage obligations.[8] Further, the defendant argues that the court erred by failing to find that the plaintiff breached the policy by requesting information and documentation that was unrelated to the proof of loss or damage. In addition, the defendant argues that, even assuming that it was obligated to cooperate with the plaintiff's requests, it eventually complied with the requests, and any delay in its compliance did not prejudice the plaintiff. We disagree.

---

[8] As part of the defendant's first claim, the defendant argues that the court improperly excluded certain deposition testimony from Levy, namely, that her purpose for making demands to the defendant was to find information that would support defenses to coverage. The defendant claims that the deposition testimony should have been admitted to impeach Levy's testimony at trial. As we explain in part I A of this opinion, we conclude that the court did not abuse its discretion in excluding this evidence. Accordingly, we review the remainder of the defendant's first claim without regard to the evidence of Levy's deposition testimony.

The defendant also claims that Levy's deposition testimony was admissible as a statement by a party opponent under § 8-3 (1) (C) of the Connecticut Code of Evidence. The defendant did not offer the testimony for this purpose at the time of the court's ruling and only subsequently raised this argument in its motion to reargue and for reconsideration of the court's memorandum of decision. Because the defendant raises this argument solely in connection with his claim of evidentiary error, we decline to review its merits, as it was not properly preserved for appellate review. See *Smith* v. *Andrews*, 289 Conn. 61, 77, 959 A.2d 597 (2008).

The following additional facts as found by the court are relevant to this claim. On January 25 and 26, 2006, before the defendant paid the taxes, Levy sent letters to the defendant requesting information and examinations under oath pursuant to the terms of the policy. The defendant's manager, William A. Orlandi, left two voice mail messages for Levy refusing to cooperate with the requests and threatening to file a lawsuit against the plaintiff as well as a complaint with the state insurance department. In response, Levy wrote a letter to Orlandi on January 30, 2006, further explaining reasons for the plaintiff's requests for documentation and the basis in the policy for the requests. The letter indicated that refusal to cooperate was grounds under the policy for denying coverage for the defendant's claim.[9]

The following week, in a telephone conversation with Levy, Orlandi again refused to cooperate or provide the documents that the plaintiff requested for its coverage investigation. On February 23, 2006, Orlandi wrote to the plaintiff on behalf of the defendant, indicating that the plaintiff's request was "hereby denied, in kind," and asked for all correspondence regarding the matter to be referred to the defendant's corporate counsel, Donald Conn. Levy called Conn on February 28, 2006, to ask for verification that the taxes were paid by the defendant. Conn said that he would get back to Levy, but never did. At trial, it was stipulated that the defendant did not cooperate with the plaintiff's coverage investigation prior to paying the city in full. The defendant continued to refuse to provide the documents requested by the plaintiff after it paid the taxes. On July 21, 2006, Orlandi and Volpicella eventually submitted to examinations under oath and produced certain documents that

[9] In the letter, Levy cited various exclusions in the policy that could preclude coverage and explained that the plaintiff had submitted its requests for information in order to determine whether the defendant's claim was entitled to coverage under the policy in light of a number of "coverage related issues" that had been raised.

the plaintiff had requested. Because of the defendant's actions, the plaintiff never completed its coverage investigation.

The court concluded that the plaintiff's multiple requests to have the members of the defendant submit to examination and produce documents were reasonable. The court found that Orlandi's and Volpicella's submission to examination under oath and production of documents "was so long after the payment of the taxes by [the defendant] that it prejudiced [the plaintiff's] ability to investigate and defend the claim." The court also found the following: "[U]nder the circumstances of this case, [the defendant's] actions breached the terms of paragraph 5 of the [p]olicy and thereby terminated the plaintiff's obligations under it. . . . Such breach resulted in prejudice to the plaintiff's ability to determine whether coverage applied and to prevent loss or damage to [the defendant]. [The] [p]laintiff is therefore not liable for any loss or damage suffered by [the defendant] through its payment of the tax liens. Accordingly, coverage is excluded under the [p]olicy . . . ." In addition, the court found that the plaintiff did not breach the terms of the policy.

A

We first address the defendant's claim that the court improperly excluded certain deposition testimony from Levy, namely, that her purpose for making demands to the defendant was to find information that would support defenses to coverage. Specifically, the defendant claims that the court improperly sustained an objection to the deposition testimony because it should have been admitted as a prior inconsistent statement to impeach Levy's testimony at trial. We disagree.

The following additional undisputed facts are relevant to our resolution of this claim. On February 4,

2011, during the defendant's cross-examination of Levy, the following colloquy took place:

"[The Defendant's Counsel]: Isn't it true that you undertook the request for information to [the defendant] to determine whether there were defenses that [the plaintiff] could avail itself to coverage?

"[The Witness]: No.

"[The Defendant's Counsel]: Ms. Levy, didn't you testify at your deposition . . . in response to my question about . . . the development agreement and all similar related documents describing rights and obligations of shareholders and investors at [the defendant], including . . . Volpicella, the information you were requesting, what would the relevance to your investigations be to that request? And you answered: Because it was important in assessing coverage to determine the relationship between . . . Volpicella as seller and . . . Volpicella as if he was a member of [the defendant] and his interest in [the defendant] because that does or it could impact coverage in this case.

"And I ask: And how so? And . . . you testified: Let's say as a hypothetical that . . . Volpicella was to sell to [the defendant] and had, say, a 50 percent interest in [the defendant] as a purchaser and . . . Volpicella owed the taxes as the seller because he's also an owner of [the defendant], it is possible that that would implicate certain defenses because there are defenses in the policy to claims that the issuer knew or should have known, and if [the defendant] and . . . Volpicella are one in the same in whole or in part, [the defendant] would have known or should have known of the taxes and that could . . . affect the coverage of determination. Do you disagree with the answer that I just read back to you from your deposition? . . .

"[Volpicella's Counsel]: I would object on the grounds that even if what he just read is accurate, he hasn't

established any inconsistency between the testimony here today and the testimony at deposition. . . .

"[The Defendant's Counsel]: . . . I asked her whether or not the purpose of [the] request for information of [the defendant] was to determine whether [the plaintiff] had defenses to their claim for insurance coverage. And she said, I believe, no, and therefore I'd like to impeach her with her deposition testimony. . . .

"The Court: All right. I'll sustain the objection because I don't think it's—what was presented is really [in] the nature of impeaching her testimony. There may have been some nuances in terms of her responses to even to that prior question or previous questions, but I don't think that's a prior inconsistent statement. So, I'll sustain the objection."

We first set forth the standard of review and applicable law governing this part of the defendant's first claim. "The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . [E]videntiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Internal quotation marks omitted.) *Silicon Valley Bank* v. *Miracle Faith World Outreach, Inc.*, 140 Conn. App. 827, 832, 60 A.3d 343 (2013). "[I]n determining whether there has been an abuse of discretion, every reasonable presumption should be made in favor of the correctness of the trial court's ruling . . . ." (Internal quotation marks omitted.) *State* v. *Creech*, 127 Conn. App. 489, 495, 14 A.3d 434, cert. denied, 301 Conn. 906, 17 A.3d 1045 (2011). "The credibility of a witness may be impeached by evidence of a prior inconsistent statement made by the witness." Conn. Code Evid. § 6-10 (a).

Making every reasonable presumption in favor of the court's ruling, we conclude that the court reasonably determined that Levy's deposition testimony was not a

prior inconsistent statement as compared to her response to defense counsel's question at trial and, therefore, properly sustained the objection by Volpicella's counsel. In her deposition testimony, as recited by the defendant's counsel at trial, Levy indicated that the plaintiff had requested information and documentation from the defendant for the general purpose of assessing its coverage obligation to the defendant. When asked how Volpicella's relationship to the defendant could impact coverage, Levy provided a hypothetical example in which she stated that the relationship could implicate certain defenses in the policy. Contrary to the defendant's assertion, this deposition testimony was not contradicted by Levy's trial testimony. Levy's reference to the hypothetical implication of defenses in the policy did not indicate necessarily that the plaintiff's purpose in requesting information from the defendant was to determine whether the plaintiff had defenses to coverage. Rather, considering the reference to policy defenses in the context of her entire answer, the court reasonably determined that the purpose of the request was to evaluate the plaintiff's general coverage obligation, which, in the hypothetical scenario described by Levy, could have been affected by any relevant defenses in the policy. This was not inconsistent with Levy's answer at trial. Therefore, we conclude that the court did not abuse its discretion in sustaining the objection to the deposition testimony.

## B

We next consider whether, under the terms of the policy, the plaintiff was entitled to request the information and documentation it sought from the defendant and whether the defendant was required to comply with such requests.[10] The defendant argues that section 5

[10] Having concluded in part I A of this opinion that the court did not abuse its discretion in sustaining the objection to the evidence of Levy's deposition testimony, we review the remainder of the defendant's second claim without regard to this evidence.

of the conditions and stipulations in the policy only permitted the plaintiff to request information related to the proof of loss or damage in light of the title of the section and, likewise, only required the defendant to comply with a request of the same nature. The defendant further argues that the plaintiff's requests went beyond the scope of section 5 because they were made in order to obtain information that would vitiate coverage and find defenses to coverage through various policy exclusions. The plaintiff argues that the plain language of section 5 authorizes the plaintiff to request information and documents to further its coverage investigation and that its requests were, therefore, authorized under this section. We agree with the plaintiff.

The following additional undisputed facts are relevant to this claim. In a letter dated June 6, 2006, on behalf of the plaintiff, attorney Frank F. Coulom, Jr., sent a letter to the defendant's attorney, Paul S. Tagatac. The letter stated the following: "This letter is to request information and documents from your client, [the defendant], to further our investigation of its tax lien claim and reach a resolution of this matter. . . . It is unclear whether [the defendant] had acquired knowledge of the tax lien on the property through its member . . . Volpicella, prior to acquiring the property. Prior knowledge of the lien would vitiate coverage of the claimed loss. To get to the bottom of that issue, [the plaintiff] requests that the following additional information and documents be provided prior to the examinations under oath . . . ."

Because this part of the defendant's claim requires that we interpret the policy, "[w]e begin by setting forth the well settled standard of review for interpreting insurance contracts. [C]onstruction of a contract of insurance presents a question of law for the court which this court reviews de novo. . . . It is the function of

the court to construe the provisions of the contract of insurance. . . . The [i]nterpretation of an insurance policy . . . involves a determination of the intent of the parties as expressed by the language of the policy . . . [including] what coverage the . . . [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy. . . . [A] contract of insurance must be viewed in its entirety, and the intent of the parties for entering it derived from the four corners of the policy . . . [giving the] words . . . [of the policy] their natural and ordinary meaning . . . [and construing] any ambiguity in the terms . . . in favor of the insured . . . ." (Internal quotation marks omitted.) *Connecticut Ins. Guaranty Assn.* v. *Fontaine,* 278 Conn. 779, 784–85, 900 A.2d 18 (2006).

We conclude that the plain language of section 5 permitted the plaintiff to request information necessary to further its coverage investigation and required the defendant to cooperate with such requests. Section 5 entitled the plaintiff to require the defendant to submit to examination under oath and produce various records and documentation which reasonably pertain to the loss or damage at issue in a claim that is being investigated. Moreover, it specifically states that the failure of the defendant to submit to examination under oath or produce other reasonably requested information shall terminate any liability of the plaintiff under the policy as to that claim. We agree with the plaintiff that it was authorized under section 5 to investigate whether the defendant's tax lien claim was entitled to coverage, and we find no support in the record for the defendant's suggestion that the plaintiff's request went beyond the scope of the policy. Contrary to the defendant's suggestion, the plaintiff's requests did not go beyond the scope of the policy merely because the requests included notice to the defendant that refusal to cooperate with its requests was grounds under the policy for denying

coverage and that prior knowledge of the lien would vitiate coverage based on the policy exclusions. We also reject the defendant's suggestion that the plaintiff's requests were not permitted merely because the defendant already had provided the plaintiff with some documentation regarding the tax liens. Accordingly, the court did not err by finding that the plaintiff's requests were reasonable under the terms of the policy and that the policy required the defendant to cooperate with such requests.

## C

Finally, we consider whether the court erred in finding that the defendant breached the policy by not complying with the plaintiff's request[11] such that it prejudiced the plaintiff. The defendant argues that it did not breach the policy because it was not obligated to comply with the plaintiff's requests, which, it claims, went beyond the scope of section 5 of the policy. Further, the defendant argues that, even if it was so obligated, it eventually complied and, therefore, did not prejudice the plaintiff. We are not persuaded.

We first set forth the standard of review and relevant law governing this part of the defendant's claim. "Whether a contract has been breached ordinarily is a question of fact, subject to the clearly erroneous standard of review." (Internal quotation marks omitted.) *Lydall, Inc.* v. *Ruschmeyer*, 282 Conn. 209, 242, 919 A.2d 421 (2007). A trial court's "findings [of fact] are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the

[11] The defendant also claims that the court erred in finding that the plaintiff did not breach the policy by requesting examinations and documentation that were beyond the scope of section 5 of the policy. Because, as we explain in part I B of this opinion, we conclude that the court did not err in finding that the plaintiff's requests were reasonable under the terms of the policy, we conclude that it was not clearly erroneous for the court to find that the plaintiff did not breach the policy by making such requests.

record as a whole. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *De La Concha of Hartford, Inc.* v. *Aetna Life Ins. Co.*, 269 Conn. 424, 432, 849 A.2d 382 (2004).

"Generally, in the absence of a reasonable excuse, when an insured fails to comply with the insurance policy provisions requiring an examination under oath and the production of documents, the breach generally results in the forfeiture of coverage, thereby relieving the insurer of its liability to pay, and provides the insurer an absolute defense to an action on the policy. . . . In the absence of estoppel, waiver or other excuse, cooperation by the insured in accordance with the provisions of the policy is a condition the breach of which puts an end to the insurer's obligation. . . . The lack of cooperation, however, must be substantial or material. . . .

"[T]he condition of cooperation with an insurer is not broken by a failure of the insured in an immaterial or unsubstantial matter. . . . [L]ack of prejudice to the insurer from such failure is a test which usually determines that a failure is of that nature. . . . A cooperation clause in [an] . . . insurance policy requires that there shall be a fair, frank, and substantially full disclosure of information reasonably demanded by the insurer to enable it to prepare for, or to determine whether there is, a genuine defense. . . . [I]t has been held that an insured's failure to disclose information breached a cooperation clause [when] . . . [t]he insured . . . [failed] to provide information requested by the insurer." (Citations omitted; internal quotation marks omitted.) *Double G.G. Leasing, LLC* v. *Underwriters at Lloyd's, London*, 116 Conn. App. 417, 432–33, 978

A.2d 83, cert. denied, 294 Conn. 908, 982 A.2d 1082 (2009).

Having thoroughly reviewed the record, we conclude that the court did not err in finding that the defendant breached the policy and prejudiced the plaintiff by failing to cooperate with its requests. As we explained in part I B of this opinion, the court properly interpreted section 5 of the policy to find that the plaintiff's requests were reasonable under the terms of the policy and that the defendant was required to comply with the requests. Accordingly, we find no merit in the defendant's argument that it was error for the court to conclude that the defendant's failure to comply breached the terms of section 5 of the policy. The defendant has offered no excuse for its failure to cooperate with the plaintiff's requests other than its argument that it was not obligated to do so under section 5, which, for the reasons explained in part I B of this opinion, is unavailing. At trial, the parties stipulated that the defendant did not cooperate with the plaintiff's coverage investigation before paying the tax liens, and the court found that the defendant continued to refuse to cooperate after paying the liens. Because the plain language of section 5 requires the defendant to submit to examination under oath and produce various records and documentation which reasonably pertain to the loss or damage, the court did not err in finding that the defendant's refusal to do so was a breach of the policy.

Further, the defendant's failure to cooperate was not immaterial or unsubstantial. Based on our review of the record, there was ample evidence to support the court's finding of prejudice. The court found that the breach resulted in prejudice to the plaintiff's ability to determine whether coverage applied and to prevent loss or damage to the defendant. Levy's January 30, 2006 letter to the plaintiff explained that the plaintiff

had submitted its requests for information to the defendant in order to determine whether the defendant's claim was entitled to coverage under the policy in light of a number of coverage related issues that had been raised. The court reasonably could have inferred from the evidence that the plaintiff's ability to investigate and defend the defendant's claim had been prejudiced when the defendant refused to comply with these requests. The court also found that Orlandi's and Volpicella's eventual submission to examination and production of certain documents was so long after the payment of the taxes by the defendant that it prejudiced the plaintiff's ability to investigate and defend the claim. The record demonstrates that nearly seven months had passed from when the plaintiff acknowledged receipt of a title claim on the defendant on December 27, 2005, to the defendant's claimed compliance on July 21, 2006. This is far from the fair, frank, and substantially full disclosure of information generally required by a cooperation clause like the one set forth in section 5. See id., 433. Accordingly, the court reasonably could have found that the plaintiff was prejudiced by the defendant's breach, even in light of Orlandi's and Volpicella's eventual submission to examination and production of certain documents. Because we are not left with the definite and firm conviction that a mistake has been committed by the court, we conclude that the challenged findings are not clearly erroneous.

II

The defendant next claims that the court improperly found that the defendant's payment under protest of the tax lien on the property was voluntary, such that it violated section 9 (c) of the policy and prejudiced the plaintiff.[12] Specifically, the defendant claims that its

[12] The defendant also argues that the court's rationale for finding that it breached section 9 (c) was flawed because it (1) improperly equated loss of title with losing ownership of property in foreclosure, (2) improperly found that even if the plaintiff determined that the liens were defects of

payment to clear title to conclude a refinance so as to forward its business expectations did not mean that it assumed liability or settled its claims for the unpaid taxes, and, therefore, it did not breach the terms of the policy. In addition, the defendant claims that its payment of the taxes did not prejudice the plaintiff because the plaintiff's right to challenge the taxes was preserved. In light of our resolution of the defendant's first claim, we do not reach the merits of this claim.

The following additional facts as found by the court are relevant to this claim. The court found that "the evidence is clear that the payment by [the defendant] was done voluntarily through its own affirmative act and without the impetus of a pending loss of title." The court found that the defendant's actions violated the terms of section 9 (c) of the policy and thereby terminated the plaintiff's obligation under it. Moreover, the court found that "[s]uch breach resulted in prejudice to the plaintiff's ability to determine whether coverage applied and to prevent loss or damage to [the defendant]. [The] [p]laintiff is therefore not liable for any loss or damage suffered by [the defendant] through such payment."

The court found that the defendant breached both sections 5 and 9 (c) of the conditions and stipulations in the policy and that each violation independently prejudiced the plaintiff's ability to determine whether coverage applied and to prevent loss or damage to the defendant. Therefore, the defendant necessarily must

---

title covered under the policy, the plaintiff still had the right to wait for the city to initiate foreclosure, (3) failed to acknowledge that the policy's definition of loss includes the existence of a title defect because the policy covers unmarketability of title and (4) failed to acknowledge that the liens alone entitled the defendant to coverage under section 7 of the policy's conditions and stipulations section. The defendant also claims that the court's finding contravened public policy by implying that taxpayers must refuse to pay taxes in order to avoid forfeiting insurance coverage.

demonstrate that the court's findings regarding both sections of the policy were erroneous in order for us to conclude that the court erred in finding that it breached the policy. Because, for the reasons set forth in part I of this opinion, we concluded that the defendant has failed to demonstrate that the court's findings regarding section 5 were erroneous, we need not address the defendant's claim that the court erred in finding that it breached section 9 (c) such that it prejudiced the plaintiff. See *Christoni* v. *Christoni*, 156 Conn. 628, 629, 239 A.2d 533 (1968) (holding secondary ground supporting trial court's decision to be immaterial when another ground was upheld by reviewing court). Accordingly, we decline to review the merits of the defendant's second claim.

III

The defendant also claims that, even assuming that it breached the policy and the plaintiff did not breach the policy, the court improperly concluded that the plaintiff was relieved of its coverage obligation to the defendant when the plaintiff's right of subrogation was unimpaired, and the defendant could have obtained payment through a subrogation claim against Volpicella. In essence, the defendant argues that the plaintiff should not have been relieved of its coverage obligation because it would not have been prejudiced by the defendant's breach so long as the plaintiff could recover in subrogation against Volpicella. Specifically, the defendant argues that the court's conclusion was erroneous because the court (1) failed to consider section 13 of the conditions and stipulations section of the policy regarding subrogation[13] and (2) improperly precluded evidence regarding Volpicella's assets. We disagree.

---

[13] Section 13 (a) of the conditions and stipulations section of the policy states in relevant part: "Whenever the [plaintiff] shall have settled and paid a claim under this policy, all right of subrogation shall vest in the [plaintiff] unaffected by any act of the insured claimant.

"The [plaintiff] shall be subrogated to and be entitled to all rights and remedies which the insured claimant would have had against any person

## A

We first address the defendant's claim that the court failed to consider section 13 of the conditions and stipulations section of the policy. The sole basis for the defendant's claim that the court failed to consider section 13 is that the court omitted any reference to that provision of the policy in its memorandum of decision. The defendant's argument erroneously presumes that the absence of a reference to section 13 in the court's decision necessarily indicates that the court failed to consider that policy provision in its analysis. The defendant has pointed to nothing in the record which would indicate that the court, in fact, failed to consider that policy provision, and there is no indication that the court did not view the contract of insurance in its entirety to derive the intent of the parties from the four corners of the policy as required by Connecticut law. See *Connecticut Ins. Guaranty Assn.* v. *Fontaine,* supra, 278 Conn. 784–85. We will not presume error by the court. Accordingly, we find no merit in the defendant's claim that the court failed to consider the subrogation section of the policy.

## B

We now consider the defendant's claim that the court abused its discretion by precluding evidence of Volpicella's assets. The defendant argues that the court

or property in respect to the claim had this policy not been issued. If requested by the [plaintiff], the insured claimant shall transfer to the [plaintiff] all rights and remedies against any person or property necessary in order to perfect the right of subrogation. The insured claimant shall permit the [plaintiff] to sue, compromise or settle in the name of the insured claimant and to use the name of the insured claimant in any transaction or litigation involving these rights and remedies. . . .

"If loss should result from any act of the insured claimant, as stated above, that act shall not void this policy, but the [plaintiff], in that event, shall be required to pay only that part of any losses insured against by this policy which shall exceed the amount, if any, lost to the [plaintiff] by reason of the impairment by the insured claimant of the [plaintiff's] right of subrogation."

should not have excluded the evidence because it would have demonstrated that Volpicella had sufficient assets to pay the plaintiff in a subrogation claim were the plaintiff to bring one. For the reasons we will set forth, we conclude that the court did not abuse its discretion.

The following additional undisputed facts are relevant to our resolution of this claim. In an objection filed on January 27, 2011, Volpicella objected to the defendant's attempt to introduce an exhibit as evidence of a purported title search on Volpicella's personal residence, arguing that the proposed exhibit was irrelevant to the declaratory action and, even if relevant, was more prejudicial than probative. The defendant filed a response on January 28, 2011, in which it argued that Volpicella's ability to satisfy a judgment against him would be relevant to counts three and four of the plaintiff's complaint. During the January 31, 2011 pretrial hearing, the court sustained Volpicella's objection, stating the following: "I would find first of all that that exhibit would be relevant only if there was a settlement or judgment [that] had already existed as between the plaintiff and either [Volpicella or the] defendant. That's not the case here. The exhibit is really related to the discovery of assets, which is something to be done by postjudgment proceedings if necessary. Although [the defendant's counsel] has filed his response that cites some Connecticut Superior Court cases, most of the appellate authority, in fact not most, all of the appellate authority relie[d] on within that objection comes from out of state, [and there] doesn't appear to be any Connecticut appellate authority directly on point.

"And I'll note that . . . [the] plaintiff's counts three and four, which deal with—declaratory judgment actions relative to coverage—that count three is based primarily on the fact that payment was voluntarily made by the defendant. Count four claims there's no coverage

in a declaratory judgment action because of the breach of the duty to cooperate on the part of the defendant.

"Neither of those counts were brought under [a] theory of any sort of subrogation, and I don't think it really relates to an issue of subrogation as to those counts. So, I think the title search itself really is irrelevant to the issues, and they're pending before [the] court on the pleadings as they now stand. So, I'm going to sustain the objection . . . ."

We first set forth our standard of review and applicable law governing this part of the defendant's third claim. "[T]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion." (Internal quotation marks omitted.) *State* v. *Creech*, supra, 127 Conn. App. 495. "All *relevant* evidence is admissible . . . . Evidence that is not relevant is inadmissible." (Emphasis added.) Conn. Code Evid. § 4-2. "Relevant evidence means evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence." (Internal quotation marks omitted.) Conn. Code Evid. § 4-1.

The court found that the purported title search of Volpicella's residence was irrelevant to the issues presented by the plaintiff's third and fourth counts, both of which sought declaratory judgments related to coverage. The court also found that neither count was brought under a theory of subrogation, that the exhibit did not relate to any issue of subrogation as to those counts and that the exhibit "would be relevant only if there was a settlement or judgment [that] had already existed as between the plaintiff and either [Volpicella or the] defendant," which it found was not the case here. Making every reasonable presumption in favor of the correctness of the court's ruling as to the relevance

of the exhibit, we conclude that the court properly excluded the evidence in accordance with our code of evidence after determining that it was irrelevant. The defendant's argument—that the court improperly excluded the exhibit because it would have established that Volpicella had sufficient assets to pay the plaintiff by way of subrogation—is unavailing because it disregards the plain language of the subrogation provision of the policy, which indicates that it is only applicable once a claim has been paid or settled by the plaintiff. Accordingly, the court could have properly determined that evidence of assets that may have been recovered in a potential subrogation claim by the plaintiff against Volpicella was not relevant to the parties' respective obligations under the policy or the evaluation of coverage before any claim had been settled or paid. Therefore, we conclude that the court did not abuse its discretion.

## IV

Finally, the defendant claims that the court improperly refused to consider its evidence that the plaintiff breached the policy for the purpose of establishing the plaintiff's bad faith. Specifically, the defendant argues that the court, *Shaban, J.,* erred by refusing to consider whether such evidence established bad faith by the plaintiff because it claims that the court was not bound by the prior ruling by the court, *Hon. Joseph M. Shortall,* judge trial referee, granting the plaintiff's motion for summary judgment regarding the defendant's counterclaim alleging bad faith by the plaintiff. We are not persuaded.

The following additional undisputed facts are relevant to the resolution of this claim. On January 18, 2011, the plaintiff filed a motion in limine seeking to limit the scope of issues to be tried. Specifically, the plaintiff requested that the court preclude the defendant from

introducing any evidence that the plaintiff acted in bad faith or violated CUTPA based on the fact that those two counts of the defendant's counterclaim were eliminated on summary judgment and were subsequently withdrawn by the defendant. In a pretrial hearing on January 31, 2011, the court, *Shaban, J.,* stated: "As to the motion [in limine] on the broader issues, the plaintiff has basically said, and I'll focus on these two at the moment, that any evidence regarding bad faith or a violation of . . . CUTPA should be prohibited based on the fact that those claims are no longer in the case. I find that Judge Shortall's ruling, clearly in the summary judgment motion, knocks out those two counts. Therefore, I would grant the motion in limine to preclude any evidence regarding bad faith or any . . . CUTPA violations, or any evidence presented for that purpose. I characterize it that way because I recognize also that because the defendant . . . has a breach of contract claim that, sometimes, evidence of a breach of contract can be used both for just that, breach of contract and evidence of bad faith. So, [to] the extent that evidence might be presented to establish a breach of contract, that's allowed, but to the extent it may be intended to establish a bad faith claim, or bad faith conduct on [the] part of the insurer, that will be precluded. And the same thing for . . . CUTPA violations."[14]

"[T]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . [I]n determining whether there has been an abuse of discretion, every reasonable presumption should be made in favor of the correctness of the trial court's ruling, and we will upset that ruling

[14] On appeal, the defendant challenges only the court's preclusion of evidence that the plaintiff acted in bad faith. Therefore, our analysis and conclusion are limited to the court's ruling on this evidence and do not apply to the court's ruling insofar as it pertained to any evidence of the plaintiff's alleged CUTPA violations.

only for a manifest abuse of discretion. . . . In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors." (Internal quotation marks omitted.) *State* v. *Creech*, supra, 127 Conn. App. 495. "[T]he right of a [defendant] to recover is limited to the allegations of [its claims or counterclaims as properly framed by the pleadings in the] complaint. . . . The purpose of the complaint is to limit the issues to be decided at the trial of a case and is calculated to prevent surprise . . . ." (Internal quotation marks omitted.) *Mamudovski* v. *BIC Corp.*, 78 Conn. App. 715, 732, 829 A.2d 47 (2003), appeal dismissed, 271 Conn. 297, 857 A.2d 328 (2004).

Because the defendant's right to recovery was limited by the allegations in its counterclaim; see id.; the court properly precluded any evidence regarding bad faith when that count effectively had been removed from the defendant's counterclaim by the court's prior summary judgment ruling in favor of the plaintiff.[15] Further, the bad faith count of the defendant's counterclaim was never restored to the docket after the defendant subsequently withdrew it. Because the bad faith counterclaim was no longer part of the proceedings, any evidence presented in support of a fact related to the plaintiff's alleged bad faith would not be material to the determination of the proceedings, and, therefore would not be relevant. Conn. Code Evid. § 4-1. Accordingly, the court properly precluded any evidence to the extent that it was intended to establish a bad faith claim or bad faith conduct by the plaintiff. Conn. Code Evid. § 4-2. Moreover, even were we to conclude that the trial court,

---

[15] To the extent that the defendant attempts to collaterally challenge the summary judgment ruling, we decline to review the merits of such a challenge because the defendant failed to appeal specifically from the court's summary judgment ruling.

*Shaban, J.,* was somehow not bound by the earlier ruling of the court, *Hon. Joseph M. Shortall,* judge trial referee, the defendant has failed to make any argument as to how the court's evidentiary ruling constituted an abuse of discretion. Making every reasonable presumption in favor of the correctness of the court's ruling, we conclude that the court did not abuse its discretion.

The judgment is affirmed.

In this opinion the other judges concurred.