******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

BRYAN BURNS *v.* RBS SECURITIES, INC.
(AC 34958)

Lavine, Sheldon and Bishop, Js.

*Argued April 7—officially released July 8, 2014*

(Appeal from Superior Court, judicial district of
Stamford-Norwalk, Genuario, J.)

*Lewis H. Chimes*, for the appellant (plaintiff).

*Daniel J. Krisch*, with whom were *Don A. Innamor-ato*, pro hac vice, and, on the brief, *Scott S. McKessy* and *John T. McDonald*, pro hac vice, for the appellee (defendant).

*Opinion*

LAVINE, J. In this breach of contract action, the plaintiff, Bryan Burns, appeals from the judgment of the trial court in favor of the defendant, RBS Securities, Inc., doing business as Royal Bank of Scotland/Greenwich Capital, rendered after a trial to the court. On appeal, the plaintiff claims that the court improperly (1) determined that he had no contractual right to a cash bonus and (2) excluded a statement made during an unrelated legal proceeding in the United Kingdom by a person purported to be an employee of the defendant. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to this appeal. The plaintiff is a former employee of the defendant, a global financial services firm headquartered in the United Kingdom. In 1987, the plaintiff interviewed with Bill Finley, a vice president of Greenwich Capital (Greenwich). The plaintiff was extended, and accepted, an offer of employment with Greenwich. The plaintiff testified that during the 1987 interview, Finley described Greenwich's compensation practices as "total compensation," which included a salary and a yearly bonus component. According to the plaintiff, Finley informed him that bonuses were a significant part of employee compensation.

After joining Greenwich as an analyst, the plaintiff worked hard and was rewarded for his efforts, rising quickly through the ranks at Greenwich. In 1993, he became a supervisor in the operations division. Years passed, and following a series of mergers and acquisitions, the defendant acquired Greenwich. Notwithstanding the merger, the plaintiff's basic pattern of compensation remained the same. In each year from 1987 until the first quarter of 2008, the plaintiff received a salary and a year-end bonus paid in cash. The value of the bonuses varied each year depending on the fiscal health of his employer and the plaintiff's job performance.

During the course of the plaintiff's employment with the defendant, the defendant published an employee policy manual and required that each employee certify in writing that "he received and was familiar with the employee policy manual." The 2007 edition of the manual, in a section entitled "Salary and Bonus," provided: "Salaries are paid to all [of the defendant's employees] biweekly. In addition, most [employees] will be eligible to receive a discretionary bonus at the end of each year. Typically, bonuses are paid in March of the following year based on the previous year's performance. Whether to award a bonus, and if so, the amount of any bonus, is determined at the sole and exclusive discretion of [the defendant]. In general, the factors [the defendant] may consider . . . include the performance of the [f]irm [and] the employee's performance . . . .

As provided above, whether or not an employee receives a bonus and the amount of the bonus is entirely within the discretion of [the defendant]."

During the plaintiff's tenure with the defendant, he reported directly to a number of supervisors. From 2005, and until the plaintiff's resignation in June, 2009, the plaintiff reported to Shawn Brosko. Brosko testified that relative to the defendant's total compensation policy, he never made any representation to the plaintiff that he would receive a cash bonus every year. Rather, Brosko testified, he told the plaintiff that he would be eligible for a discretionary bonus following the close of each fiscal year. He further elaborated that getting a bonus one year did not mean that an employee would get one the next year. Brosko also testified that a small number of employees had contracts entitling them to a guaranteed bonus, but that these agreements were always made in writing and signed by the defendant's chief executive officer.

Brosko also testified that the plaintiff was responsible for the supervision of a number of employees and that part of this responsibility included determining whether these subordinate employees would receive a bonus, and if so, in what amount. Brosko testified that the plaintiff, in his capacity as a supervisor, was required to follow the employee manual and instruct employees that even if a bonus was paid in a current year, he did not have the authority to guarantee that a similar bonus would be paid the following year. Jackqueline Hayes, an employee whom the plaintiff supervised, testified that before she was awarded a bonus for the year she would meet with the plaintiff to discuss her performance. Hayes testified that on the basis of these meetings, she understood that the award of a bonus was discretionary.

Throughout the plaintiff's employment, the bonuses he received often exceeded his yearly salary. For his work in the calendar years of 2005 and 2006, he was paid an annual salary of $200,000 each year, and was awarded $310,000 and $351,000 in bonus compensation, respectively, for each year. Each bonus was paid in cash during the first quarter of the following year.

In 2007 and 2008, the financial performance of the defendant declined as the global financial crisis unfolded. In 2007, this performance decline led to a reduction in the bonus pool. Accordingly, in March, 2008, the plaintiff received a cash bonus in the amount of $255,750 for the work he had done in 2007. Toward the end of 2008, the defendant's financial performance continued to deteriorate. In order to stabilize the defendant's financial condition—which, according to one witness was on the verge of bankruptcy—the government of the United Kingdom injected cash into the defendant in October, 2008, and January, 2009. In exchange for these cash infusions, the United Kingdom received an

ownership interest in the defendant and became its largest shareholder.

During an international conference call with top executives of the defendant in late 2008, the plaintiff was informed that bonuses "would not be paid like last year." In January, 2009, the plaintiff was informed that those eligible for bonuses would be subject to a "deferral program." In lieu of cash bonuses, the defendant would defer bonus payments by issuing bonds that would vest over a three year period, with vesting dates in June, 2010, June, 2011, and June, 2012. The "deferral program" also provided that, if an employee left the defendant's employ before the bonus vested, the bonus would be forfeited.

In March, 2009, the plaintiff was awarded a deferred bonus with a face value of $198,000, payable over three years. He resigned in June, 2009, before the first vesting date in June, 2010. The defendant determined that because the plaintiff resigned prior to the first vesting date in June, 2010, the plaintiff had forfeited his right to a bonus.

Shortly thereafter, the plaintiff commenced this action and alleged in a three count complaint (1) breach of contract, (2) promissory estoppel, and (3) wrongful withholding of wages pursuant to General Statutes § 31-72. Following a trial to the court, the court found in favor of the defendant on all of the plaintiff's claims. In its memorandum of decision, with respect to the plaintiff's breach of contract claim, the court found that "there never was a contractual agreement between the plaintiff and the defendant pursuant to which the plaintiff was guaranteed bonuses each and every year." Rather, the court found that "[t]he firm always retained the right to determine whether or not there would be any money available for bonuses and to withhold bonuses in its sole discretion if it determined that there was no money available." The plaintiff thereafter appealed from the judgment of the trial court, but only as to his breach of contract claim.

I

The plaintiff first contends that the court erred when it found that the defendant was not contractually obligated to pay him a cash bonus for the 2008 calendar year. Specifically, the plaintiff argues that the defendant's "total compensation policy" constituted an implied contractual agreement requiring the defendant to pay him a cash bonus every year and that the defendant's "deferral program" was a breach of this agreement.

We begin with the pertinent principles of law and the standard of review governing our disposition of the plaintiff's claims on appeal. "At the outset, we note that all employer-employee relationships not governed by express contracts involve some type of implied 'con-

tract' of employment." *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 13, 662 A.2d 89 (1995). "An implied contract depends upon the existence of an actual agreement between the parties. . . . Whether the parties have entered into such an agreement is a question of fact. . . . It is the plaintiff's burden to prove, by a preponderance of the evidence, that the defendants had agreed by either words or deeds to recognize and undertake a contractual commitment to pay a bonus for the preceding year . . . . Absent specific contract language, whether there was a contract, and the terms of that contract, are questions of fact." (Citations omitted.) *Christensen* v. *Bic Corp.*, 18 Conn. App. 451, 454, 558 A.2d 273 (1989).

Therefore, "our review is limited to a determination of whether the [court's] findings are clearly erroneous. . . . [W]e must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . Since the case was tried to the court, the trial judge is the sole arbiter of the issues of weight and credibility. . . . We must give the evidence the most favorable reasonable construction to support the judgment." (Citations omitted; internal quotation marks omitted.) *Fortier* v. *Newington Group, Inc.*, 30 Conn. App. 505, 509–10, 620 A.2d 1321, cert. denied, 225 Conn. 922, 625 A.2d 823 (1993).

The plaintiff claims that the court "ignored . . . uncontradicted testimony" that the defendant was obligated to pay him a cash bonus. Our review of record, however, convinces us that the court's factual findings as set out in its well reasoned memorandum of decision are supported by the evidence and are not clearly erroneous.

In this case, the trial court's findings are supported by the record. The evidence presented to the court included the testimony of the plaintiff's direct supervisor, Brosko, who stated that the plaintiff was never guaranteed a cash bonus, but rather was told that he was merely *eligible* for a bonus that could be awarded on the basis of a number of discretionary factors. The supervisor's testimony was consistent with that of the plaintiff himself, who testified that he was told he would be "eligible" for a yearly bonus and that the amount of the bonus would be at the discretion of the defendant. Furthermore, both the testimony of Brosko and the plaintiff was consistent with the defendant's employee handbook, which the plaintiff acknowledged in writing that he understood. The 2007 handbook language provided that bonuses were discretionary in nature, and

subject to, among other things, the financial health of the company and employee performance.

The gravamen of the plaintiff's claim on appeal is essentially that the court ignored evidence of the defendant's history of paying yearly bonuses in cash in determining that there was no contractual obligation to pay bonuses. Although the plaintiff has demonstrated that there was such a pattern and that he received cash bonuses in varying amounts throughout his employment, the mere practice or custom of an employer does not, by itself, create a contractual obligation. See *Christensen* v. *Bic Corp.*, supra, 18 Conn. App. 456 ("contracts are not created by evidence of customs and usage").[1] Rather, the plaintiff had the "burden to prove, by a preponderance of the evidence, that the defendants had agreed by *either words or deeds* to recognize and undertake a contractual commitment to pay a bonus . . . ." (Emphasis added.) Id., 454. In this case, the record supports the court's finding that the defendant's pattern of awarding cash bonuses to the plaintiff was consistent with a discretionary bonus program and not a contractual obligation to award him a yearly cash bonus.

As the trial court noted, "[t]he undisputed evidence indicates that the [defendant's] performance in 2008 was so abysmal that the highest levels of management determined that there was no money available for cash bonuses at all . . . [and] that the firm would have gone bankrupt had it not been for a government bailout by the United Kingdom. Rather than change the rules after the fact, as the plaintiff claims, the defendant simply determined that there was no cash available for bonuses and exercised its discretion to not make any money available for a bonus pool to be distributed. [The deferred bonus program] is not a change in the [defendant's compensation policies], as alleged by the plaintiff, but rather an application of the [policies] to an unprecedented fiscal calamity. Indeed, the plaintiff does not seem to have a credible method of calculating [his] claim if the defendant, rather than engaging in the deferred award program, simply issued zero dollars for bonuses or one dollar for [a] bonus."[2]

"[A] finding of fact is clearly erroneous [only] when there is *no evidence in the record to support it* . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Emphasis added; internal quotation marks omitted.) *Groton* v. *Yankee Gas Services Co.*, 224 Conn. 675, 691, 620 A.2d 771 (1993). On the basis of our review of the record, we cannot say that we are left with the firm conviction that a mistake has been made. Rather, the court properly concluded that the plaintiff was merely *eligible* for discretionary bonus compensation and that a deferred bonus resulting from

abysmal business performance was consistent with the terms of his employment.[3]

## II

The plaintiff also claims that the court erroneously "excluded an exhibit that indicated that the British government provided a sufficient cash infusion to pay year-end bonuses." Specifically, the plaintiff contends that the court abused its discretion when it sustained the defendant's objection to the admission of a four page witness statement made during litigation in the United Kingdom by Julian Ingleby, purportedly the "head of Executive Reward" for the defendant.

The following additional facts are relevant to this claim. At trial, the plaintiff sought to admit exhibit 21, an undated and unsigned affidavit purportedly made by Ingleby during litigation in London, United Kingdom. The affidavit was disclosed to the plaintiff during discovery and stated generally the terms of the United Kingdom's cash infusion into the defendant. The plaintiff sought to introduce the affidavit to show that the defendant had cash on hand to pay cash bonuses to its employees.[4] He sought to admit the document as an admission of a party opponent. At trial, the plaintiff represented to the court that the document was produced as a response to a request for production that asked for "[a]ll documents relevant in any way" or "[a]ll documents reflecting in any manner the change in the way [the defendant] awarded bonuses in 2008." The court responded, stating that "what you're asking me to admit into evidence effectively is an answer to a question—and I don't know what the question was. . . . I don't know what it was produced in response to." The court thereafter sustained the defendant's objection and ruled that the affidavit was not admissible.

It is well established that "[t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . [E]videntiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the [plaintiff] of substantial prejudice or injustice. . . [I]n determining whether there has been an abuse of discretion, every reasonable presumption should be made in favor of the correctness of the trial court's ruling . . . ." (Citation omitted; internal quotation marks omitted.) *Chicago Title Ins. Co.* v. *Bristol Heights Associates, LLC*, 142 Conn. App. 390, 403, 70 A.3d 74, cert. denied, 309 Conn. 909, 68 A.3d 662 (2013).

Pursuant to Connecticut Code of Evidence § 8-3 (1) (C), "a statement by a person authorized by the party to make a statement concerning the subject" is not subject to the hearsay rule. However, "[b]efore evidence can be admitted to show what an agent said, it must be established that the agent was authorized by the

principal to make an admission. . . . The agency relationship must be proved by a fair preponderance of the evidence." (Citations omitted; internal quotation marks omitted.) *Chieffalo* v. *Norden Systems, Inc.*, 49 Conn. App. 474, 478, 714 A.2d 1261 (1998).

In this case, for the affidavit to be admissible, the plaintiff was required to establish that Ingleby had the authority to speak on the defendant's behalf. This he did not do. The plaintiff relies on the affidavit itself to prove the existence of this authority because Ingleby testified that he was the head of "Executive Reward [at the defendant]," and that he was responsible for overseeing and administering the defendant's bonus program. It is well established that "agency cannot be . . . proved . . . by the declarations of the [purported] agent. The agency must be proved in some other way before the declaration of the agent can be admissible against his principal." *Metropolitan Cleaners & Dyer, Inc.* v. *Tondola*, 114 Conn. 244, 246, 158 A. 240 (1932).

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The plaintiff argues that the court ignored the "controlling precedent" of *Ziotas* v. *Reardon Law Firm, P.C.*, 296 Conn. 579, 997 A.2d 453 (2010), because, "[in that case], the Supreme Court affirmed the Appellate Court's determination that in an employer-employee relationship, a contract for a discretionary bonus is an enforceable contract."

The holding in *Ziotas*, with respect to the employer's contractual obligation to pay a bonus, turned on its own particular facts, including evidence that a verbal promise had been made by the employer to the employee that "this has been a very successful year for the firm, and for you, and . . . you're going to get a bonus that fairly reflects that." (Internal quotation marks omitted.) *Ziotas* v. *Reardon Law Firm, P.C.*, 111 Conn. App. 287, 300, 959 A.2d 1013 (2008), rev'd in part on other grounds, 296 Conn. 579, 997 A.2d 453 (2010). In this case, no such promise was made by the defendant.

[2] The plaintiff also argues that the deferred bonus program breached the defendant's obligation of good faith and fair dealing toward him. This claim fails because it was not alleged in the plaintiff's complaint. It is also without merit because, as discussed herein, the defendant was never contractually obligated to pay the plaintiff a cash bonus.

[3] In his brief, the plaintiff argues that the court misconstrued his claim when it characterized his claim as one for a "guaranteed bonus." The plaintiff argues that "[he] has never claimed that he was entitled to a 'guaranteed' bonus. Total compensation meant that if one performed well, you received a cash bonus at the end of the year. Although poor firm performance might affect the amount of the bonus, a good performer still got a bonus." We do not believe that the court misconstrued the plaintiff's claim.

[4] The admissibility of the Ingleby affidavit is essentially a collateral issue that is not relevant to whether the defendant was contractually obligated to pay the plaintiff a bonus. Even if we assume that the affidavit was improperly excluded, the error was harmless because the affidavit was evidence of the defendant's *means* to pay a bonus, not evidence of a legal *obligation* to pay a bonus.